**LANDMARK HEALTH CARE ASSOCIATES L.P.–1989–A, an Indiana Limited Partnership, D/B/A Prairie View Health Care Center; The Landmark Corporation et al., Appellants (Defendants Below),**

v.

**Barbara L. BRADBURY, Laura L. Disher and Linda A. Ketrow, Trustees of James R. Bradbury, beneficiary and N. Charlene Bradbury, 614 Nancy Street, Warsaw, Indiana 46580, Appellees (Plaintiffs Below).**

No. 43S04–9505–CV–576.

Supreme Court of Indiana.

Oct. 2, 1996.

---

Jeffrey C. McDermott, James W. Stevenot, Krieg DeVault Alexander & Capehart, Indianapolis, for Appellant.

Duane G. Huffer, Warsaw, for Appellee.

## ON PETITION TO TRANSFER

SELBY, Justice.

Two questions are involved in this appeal: (1) whether summary judgment is appropriate in this case, and (2) whether the trial court abused its discretion by ordering the defendant to pay a judgment which included an interest rate in excess of the statutory rate. We affirm the trial court's grant of summary judgment, but we remand for modification due to the imposition of an excessive interest rate.

## FACTS

In September 1988, Landmark Health Care Associates ("Landmark") executed an agreement with Prairie View Rest Home, Inc. ("Prairie View") to purchase the Prairie View Nursing Home. Landmark agreed to pay $3 million for the nursing home—$2.25 million at closing, and $250,000 plus accrued interest in January of 1990, 1991, and 1992.

The parties closed the deal on December 22, 1988, when Landmark executed and delivered a mortgage securing its promissory note to Prairie View. Prairie View subsequently filed for dissolution, and assigned its rights, title, and interest in the mortgage and note to "N. Charlene Bradbury and Linda S. Ketrow, Laura L. Disher and Barbara L. Bradbury, Trustees of James R. Bradbury" (collectively "Bradbury"). (R. at 338).

On September 25, 1991, a fire caused extensive damage to the nursing home. In an inspection which was conducted shortly after the fire, the Indiana State Fire Marshal determined that the nursing home's sprinklers and doors did not meet applicable fire codes.[1]

After Landmark failed to make the January 1992 payment, Bradbury commenced this action. Landmark answered, raising several affirmative defenses, including breach of the covenants, representations, and warranties in the sales agreement. Landmark also filed a counterclaim, alleging breach of warranty based on Prairie View's failure to disclose the nursing home's alleged latent defects and fire code violations.

Bradbury moved for summary judgment on its amended complaint and on Landmark's counterclaim. The trial court granted Bradbury's motion:

> This matter having been submitted to the Court for hearing on motion for summary judgement filed herein by [Bradbury] and the response thereto of [Landmark], and the Court having considered said motion, response, pleadings and papers filed in this case, and affidavits in support thereof ... and being duly advised in the premises NOW FINDS that [1]

---

1. In particular, the State Fire Marshal found that in "several areas sprinklers are blocked by lighting, storage and several have severe corrosion." The report also noted deficiencies in that several doors were not being held open by devices which would automatically close upon activation of the fire alarm. (R. at 342–45).

after the date of *Agreement for the Purchase and Sale of Prairie View Nursing Home,* September 7, 1988, and prior to date of promissory note and date of mortgage, [Landmark], under the agreement, had the rights to determine if Plaintiffs' assignor was fully licensed, to inspect the nursing home facility of Plaintiffs' assignor, to determine that Plaintiffs' assignor's representation and warranties of the agreement were true and correct, and if not, require Plaintiffs' assignor, prior to delivery of note and mortgage, to correct same; [2] that reports of inspection of the sprinkler system of the nursing home facility, by an independent contractor used by both Plaintiffs' assignor and Landmark indicated that the sprinkler system was in proper condition and that public notice to the public that the sprinkler system may not operate properly under fire conditions was not made for several months after delivery of note and mortgage; [3] that the Indiana Department of Fire and Building Services determined that the nursing home facility met the conditions of the Life Safety Code of the National Fire Protection Association on December 7, 1988, a date prior to delivery of the note and mortgage; and [4] that there is no genuine issue as to any material fact and that Plaintiffs are entitled to judgment as a matter of law.

The Court FURTHER FINDS that Plaintiffs are entitled to have and recover of and from the Defendants ... for the principal amount due thereon in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00), together with interest accrued on said note to date in the amount of Sixty-eight Thousand Eight Hundred Fifty-five and 80/100 Dollars ($68,855.80), together with attorney fees in the amount of Four Thousand Six Hundred Fifty-three Dollars ($4,653.00) and together with lien title search expense in the amount of Fifty-five dollars ($55.00), for a total judgment in the amount of Three Hundred Twenty-three Thousand Five Hundred Sixty-three and 80/100 Dollars ($323,563.80), together with interest thereon at the rate of Ten percent (10%) per annum from and after this date until paid and without relief from valuation and appraisement laws.

(R. at 408–11).

Landmark appealed, arguing that the trial court's order is erroneous as a matter of law for three reasons: (1) Landmark's right to determine the truth of the Plaintiffs' warranties imposed no affirmative duty on Landmark to verify that such warranties were true, (2) the trial court's order erroneously holds that the Plaintiffs did not breach their warranties because they lacked knowledge of the defects and the fire code violations when the warranties were made, and (3) the trial court's order fails to consider and harmonize all provisions of the purchase agreement. Bradbury did not address these arguments. Instead, Bradbury argued for affirmance on another basis, that Prairie View did not breach any of the warranties.[2] The Court of Appeals addressed this contention and determined that the "designated materials reveal conflicting facts about the condition of the sprinkler system at the time of closing." Slip Op. at 13. Hence, the Court of Appeals determined that summary judgment is inappropriate in this case. Bradbury then sought transfer, arguing that the Court of Appeals disregarded the binding effect of a determination of fact by the Indiana State Fire Marshal.

This case presents a novel question for us: whether a buyer may sue for breach of contract warranty based upon evidence coming to light three years after closing, or whether a seller can reasonably rely on the actions of the Fire Marshal, an Officer of the State. Under the unique circumstances of this case, we affirm the trial court's grant of summary judgement to Bradbury. Defendants also raise the issue of whether the trial court erred by ordering the defendants to pay interest in excess of the statutory limit. We find that the trial court did so err, and we remand for modification consistent with this opinion.

2. We will sustain a grant of summary judgment if it is sustainable on any legal basis supported by the record. *Stephenson v. Ledbetter,* 596 N.E.2d 1369 (Ind.1992).

## I. Standard of Review

In an appeal from a grant of summary judgment, the reviewing court faces the same issues as the trial court, *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514 (Ind. 1994), as summary judgment is appropriate only if the pleadings and evidence show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R. 56(c). Thus, even though a summary judgment is presumed to be valid and the appealing party bears the burden of persuasion, the appellate court follows the same process as the trial court. *Drake v. Mitchell*, 649 N.E.2d 1027 (Ind.1995). The reviewing court must provide careful scrutiny of the trial court's determination to assure that the non-prevailing party is not improperly denied his day in court. *Indiana Dept. of State Revenue v. Caylor–Nickel Clinic, P.C.*, 587 N.E.2d 1311 (Ind.1992). A reviewing court will affirm a grant of summary judgment on any legal basis which is supported by the designated evidentiary matter found in the record. *Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.*, 622 N.E.2d 935 (Ind.1993), *cert. denied*, 510 U.S. 1195, 114 S.Ct. 1302, 127 L.Ed.2d 654 (1994).

## II. Date of Importance

Our first task is to determine the date to which the agreement speaks with respect to the warranties. Bradbury directs us to *Dittman v. Nagel*, 43 Wis.2d 155, 168 N.W.2d 190 (1969), in which the warranty in a real estate purchase agreement stated the following:

> The seller warrants the well on the herein described premises to be of sufficient depth and produces an adequate supply of water for human consumption.

*Id.*, 168 N.W.2d at 191. In determining the date to which the warranty spoke, the Wisconsin Supreme Court applied common law principles of warranty and relied on 46 Am. Jur., *Sales*, § 375, which states in pertinent part as follows:

> The ordinary warranty as to condition or quality relates to the time of sale, and if broken at all is broken when the sale is made.

*Id.* at 194. That court determined that if the warranty had been breached, it would have been breached on the date of closing and not thereafter. In that case, the buyers were unable to demonstrate that a breach had occurred at the time of sale. *See also, Nachazel v. Miraco Mfg.*, 432 N.W.2d 158 (Iowa 1988).

Here, the purchase agreement includes the following pertinent provisions:

> Section 6 ... [T]he Project and the use thereof *comply* with all applicable public and private restrictions, regulations, ordinances and laws.... [T]he project *now conforms* to all applicable building codes, zoning ordinances, environmental laws, rules and regulations and other restrictions governing the use of the Project....

> 7.2 The use and operation of the Project *now is, and at the Closing will be,* in full compliance with applicable building codes, zoning, land use and environmental laws, and other local, state or federal laws and regulations unless otherwise waived; and there *are* no licensing deficiencies, fire code violations, or any other deficiencies which exist for which an appropriate waiver may not be obtained.

> 7.11 There *are* no licensing deficiencies, fire code violations, or any other deficiency of any nature known to Seller that would in any way materially adversely affect the right of Buyer to operate the Project in the same manner and for the same purpose as it has heretofore been operated, that is, as an intermediate care nursing home; and further, the Project may fully participate and be certified by the appropriate state and federal agencies allowing the Project to receive payments from Medicaid.

(R. at 326–28) (emphasis added). The language of the purchase agreement is similar to the language in *Dittman* in that the warranties are expressed in words of the present tense. We agree with Bradbury that the warranties speak to the closing date.

Landmark argues, however, that § 13.3 of the purchase agreement defeats the closing date as the relevant date. Section 13.3 reads:

All representations and warranties of the Seller and the Buyer contained in this Agreement will survive the closing of this transaction.

(R. at 332). Landmark argues that the "purpose of Paragraph 13.3's survival provision was to protect the Defendants from latent defects, like fire code violations, which predated the Purchase Agreement but were not discovered until later." (At. R. Br. at 7). We agree with Landmark that the purpose of this clause is to protect the buyer from defects which existed at the time of closing but were not discovered until later. However, we fail to see how this does not speak to the date of closing. Even considering § 13.3, Landmark still must demonstrate that the defect existed at the time of closing.

Thus, we agree with the Court of Appeals that the relevant time to determine whether a breach of warranty occurred is at the time of closing.

### III. Evidence of Meeting or Failing to Meet the Code at Date of Importance

■ Bradbury contends, and the trial court agrees, that there is sufficient unrebutted evidence that the sprinklers met the code at the time of closing. Keith Lazoff of Shambaugh and Son, Inc. inspected the nursing home's fire sprinkler system four times in 1988.[3] Each of these reports stated that all sprinklers were free from corrosion, loading or obstruction to spray discharge. No "desirable improvements" were recommended in any of the reports. Additionally, on December 7, 1988, Jeffrey L. Short, Assistant Director of the Inspection Division of Office of State Fire Marshal, State of Indiana, issued a Life Safety Status Report to the Indiana State Board of Health stating that the facility met the Life Safety Code conditions for participation in Medicare.[4] In reference to that inspection, Short, along with Donald Donath, Chief Inspector of the Indiana Department of Fire and Building Services, sent a letter to N. Charlene Bradbury. That letter, dated December 20, 1988, two days prior to

closing, stated that "[t]here are no remedial activities necessary on the above referenced facility to be taken at this time." (R. at 118). The following year, on October 3, 1989, Deputy Fire Marshal Roger Campbell inspected the facility and determined that the facility met the Life Safety Code for certification. On October 17, 1989, Short issued a Life Safety Status Report to the Indiana State Board of Health stating that the facility met the Life Safety Code condition for participation. This was almost ten months after closing. The same Fire Marshal conducted an inspection on November 13, 1990, almost two years after the sale, which did not reveal any deficiencies with the sprinkler system. Additionally, Lazoff inspected the sprinklers four times in 1989.[5] All four reports indicated that the sprinklers were free from corrosion, loading or obstruction to spray discharge. Again, no "desirable improvements" were recommended in any of the reports.

Contrary to Landmark's assertions, these inspections do not merely raise an inference that the fire safety system met the code requirements at the time of closing. These inspections amount to significant evidence that the sprinklers were free from defects. Additionally, Bradbury argues that the Fire Marshal's report and letter at the time of the sale, both of which indicated no existing problems, should be given controlling effect. Bradbury cites *Harrell v. Sullivan*, 220 Ind. 108, 40 N.E.2d 115, 118 (1942) for the proposition that "this Court must presume that the public officers . . . can and will discharge the duties imposed upon them according to law." Similarly, in *Vonnegut v. Baun*, 206 Ind. 172, 188 N.E. 677 (1934), a case involving the board of health requiring small pox vaccinations to prevent the prevalence or spread of the disease, we stated that

> the statute and an ordinance of the city of Indianapolis hereinafter set out vest the board of health with jurisdiction to determine whether an epidemic exists. Under such authority the determination of the

---

**3.** The 1988 inspection reports are dated January 22, May 9, July 7, and October 14.

**4.** The Life Safety Code requires functional automatic sprinkler protection in nursing home

buildings of this type. NATIONAL FIRE PROTECTION ASSOCIATION, LIFE SAFETY CODE § 13–1.6 (1991).

**5.** The 1989 inspection reports are dated January 10, April 21, July 17, and October 17.

board upon the question involved is conclusive in the absence of fraud or bad faith....

*Id.,*188 N.E. at 678.

Bradbury also cites *Smith v. Lippman,* 222 Ind. 261, 53 N.E.2d 157 (1944), where this Court stated that "[c]ourts will not assume the duties of ministerial fact-finding bodies, but will only intervene where the ministerial officer or board has acted unlawfully, arbitrarily, or unreasonably." In *Smith,* Lippman appealed a fire marshal's order which required Lippman to remove a building. Lippman argued that he should be allowed to repair the building instead. The trial court agreed and vacated the order upon completion of repairs. Since we did not prohibit the party from challenging the fire marshal's order, nor did we prohibit the court from vacating or overruling a fire marshal's order, Landmark argues that *Smith* does not support Bradbury's position. Although Bradbury merely quoted from *Smith* without explanation, we agree that *Smith* supports Bradbury's position. In upholding the trial court's judgment to vacate the fire marshal's order, we noted that the deputy fire marshal had found that repairs could be done and would only cost about one-half as much, but the fire marshal ordered removal because "it would not be good business to repair." *Id.* 53 N.E.2d at 157. Thus, we simply allowed Lippman to choose between two options, both of which were supported by the fire marshal's factual findings.

Turning to the case at bar, we note that the Indiana Legislature has imposed the duty upon the state fire marshal to conduct inspections of health facilities, including nursing homes. I.C. § 16–28–1–13. Since the inspections were performed in the discharge of official duties, our case law supports Bradbury's contention that the fire marshal's report should be given effect. Without evidence to the contrary, we must presume that the fire sprinkler system met code conditions at time of closing.

■ Landmark's only evidence in an attempt to rebut this conclusion comes after the fire occurred. First, a Fire Safety Survey Report which was completed on October 30, 1991, approximately one month after the fire, stated that "[in] several areas sprinklers are blocked by lighting, storage and several have severe corrosion," and that some of the doors did not close tightly in accordance with requirements. (R. at 342). Next, Landmark presented an affidavit from Michael Sweeney, President of Central Healthcare Management Company, Inc., a general partner of Landmark. According to Sweeney, neither Central Healthcare nor Landmark made any "material changes to the Nursing Home's sprinkler system, doors or other fire safety systems at any time from the date that Landmark purchased the Nursing Home on September 7, 1988[sic] until after the Indiana State Fire Marshal discovered the existing fire code violations in October, 1991." (R. at 406). Finally, they offer an affidavit from Milton Kuyers, President of Star Sprinkler Corporation, the manufacturer of the sprinkler system in question. This affidavit reveals that Star Sprinkler had issued a public notice that the sprinklers which were manufactured between 1959 and 1981 are susceptible to corrosion which would prevent water from reaching an open sprinkler. Thus, the sprinklers may not operate properly.

Although Landmark has presented evidence that the sprinklers did not meet code at the time of the fire in 1991, Landmark has presented no evidence that the sprinklers were defective at the time of closing. It is quite possible that the sprinklers met code at closing, then gradually corroded. Kuyers' affidavit, which Landmark offers as evidence that the defect existed at the time of closing, does not shed any light on when the corrosion may have occurred. Without any evidence to the contrary, we must accept the Fire Marshal's report that the sprinklers were free from defects shortly prior to closing, as well as in October of 1989 and December of 1990. Landmark has failed to produce any evidence to rebut this conclusion.

Thus, we agree with the trial court that summary judgment is appropriate.

## IV. Interest Rate

■ In its Order, the trial court awarded judgment against Landmark in the amount of $323,563.80 plus post-judgment interest at a rate of ten percent per year. Landmark

argues that the ten percent interest rate is in excess of the statutory rate. We agree. I.C. § 24–4.6–1–101 states in part: "interest on judgments for money whenever rendered shall be from the date of the ... finding of the court until satisfied at a ... rate which shall not exceed an annual rate of eight percent (8%)." Public Law 208–1993 § 1, which amended I.C. § 24–4.6–1–101, provided that this amendment become effective on January 1, 1994, more than two months prior to the trial court's order.

In several cases, our Court of Appeals has concluded that a trial court lacks the authority to award interest in excess of the statutory rate to be paid on a judgment. *See, Crowe v. Crowe,* 555 N.E.2d 180 (Ind.Ct.App. 1990); *Hasty v. Hasty,* 427 N.E.2d 1119 (Ind. Ct.App.1981). The statutory maximum applicable to this case for post-judgment interest is eight percent. Therefore, the trial court erred as a matter of law by ordering Landmark to pay interest at a rate of ten percent on the judgment.

### Conclusion

The trial court's summary judgment is affirmed. The case is remanded to the trial court for proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.