**Connie NASS, Auditor of the State of Indiana, Appellant–Defendant,**

**v.**

**STATE ex rel. UNITY TEAM, LOCAL 9212, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) and American Federation of Teachers (AFT) and pursuant to Trial Rule 19, Frank O'Bannon, Governor of the State of Indiana, and as intervening Relator, American Federation of State, County and Municipal Employees, Council 62 (AFSCME), Appellees–Relators.**

No. 49A04–9901–CV–34.

Court of Appeals of Indiana.

Oct. 12, 1999.

Rehearing Denied Nov. 22, 1999.

James Bopp, Jr., Barry A. Bostrom, Bopp, Coleson & Bostrom, Terre Haute, Indiana, Doris Anne Sadler, Legal Counsel, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, A. Scott Chinn, Geoffrey Slaughter, Special Counsels to the Attorney Gen-

eral, Indianapolis, Indiana, Attorneys for Appellee Governor.

Barry A. Macey, Macey, Macey and Swanson, Indianapolis, Indiana, Attorney for Appellee Unity Team.

Mary Jane Lapointe, Richard J. Darko, Lowe Gray Steele & Darko, LLP, Indianapolis, Indiana, Attorneys for Appellee AFSCME.

## OPINION

RUCKER, Judge

### Case Summary

This is an appeal by the Auditor of the State of Indiana challenging the trial court's grant of partial summary judgment arising out of a complaint for mandamus. On petition by several unions and the Governor of the State of Indiana, the trial court mandated the Auditor to honor certain voluntary wage assignments for the deduction of fair share payments from the paychecks of non-union member State employees. The wage assignments were an outgrowth of labor settlement agreements negotiated between executive branch department heads and several unions. The agreements were approved by the Governor. In addition to the order of mandate the trial court also declared that the fair share provision contained in the settlement agreements was legal and enforceable. The Auditor raises several issues for our review. We address the following dispositive issues rephrased as: (1) did the Governor have the authority to approve the settlement agreements without specific enabling legislation; (2) did the trial court err in declaring legal and enforceable the fair share provision contained in the settlement agreements; and (3) were the voluntary wage assignments authorized by statute. We affirm in part and reverse in part.

### Facts and Procedural History

In 1990 then Governor Evan Bayh issued Executive Order 90–6 which laid the groundwork for executive branch State employees to join labor unions. In issuing the Order the Governor acknowledged that he could not institute meaningful and responsible collective bargaining by executive order. However, according to the Governor he did have the authority to lay the foundation for collective bargaining by providing for elections of employee representatives. Accordingly, Executive Order 90–6 created a procedure for the recognition of an employee organization as the exclusive negotiating organization for members of an appropriate unit. Among other things, the Order provided that the negotiating organization was entitled to meet and negotiate with the State Personnel Director on matters of wages, hours, and working conditions in an effort to reach a settlement subject to the Governor's approval. In addition, the Order required the negotiating organization to represent all employees of the bargaining unit regardless of whether the employee was a member of the organization.

Pursuant to Executive Order 90–6 employees in various units chose representation by either the "Unity Team"[1] or the American Federation of State, County, and Municipal Employees (AFSCME) (referred to collectively as "the Unions"). Thereafter the Unions proceeded to negotiate with the State Personnel Director and other executive branch department heads extensive and detailed labor agreements which the parties refer to as "Settlements." The Settlements covered wages, hours, and other terms and conditions of employment. They applied to union and non-union members alike. In 1994, the Settlements were approved by Governor Bayh through Executive Orders 94–1 and 94–2. Those Settlements expired by their terms at midnight June 30, 1997.

1. The Unity Team is comprised of a number of unions including the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), the American Federation of Teachers (AFT), and the Unity Team, Local 912 of the International Union.

Thereafter the Settlements were renegotiated and on October 1, 1997, were approved by present Governor Frank O'Bannon through Executive Order 97–33. Among other things the Settlements contain what is commonly referred to as a "fair share" provision.[2] In relevant part the provision dictates:

> [a]ll employees hired after October 1, 1997 must begin paying to the Union, on January 1, 1998, their fair share of the costs of providing Union representation, in an amount not exceeding eighty-five percent (85%) of the dues required to be paid by employees who are members of the Union. The amounts required of nonmembers shall not include fees, charges, and assessments involving political contributions. Employees required to pay fair share may make such payments by paycheck withholding.... *All monies collected by the Union pursuant to this provision must be held in escrow until it is determined by a court of general jurisdiction that this fair share provision is lawful.*

R. at 44, 102–03 (emphasis added). In October 1997, the Unions began submitting to the Auditor authorization forms referred to as wage assignments. The forms were signed by State employees requesting that their fair share assessment be withheld from their wages. However, in April 1998, Morris Wooden, the State Auditor at the time, began printing the following notation on the pay stubs of State employees: "THE AUDITOR OF STATE WILL NOT HONOR A UNION FAIR SHARE DEDUCTION. IF YOU HAVE AN ERRONEOUS FAIR SHARE DEDUCTION, PLEASE CONTACT YOUR PAYROLL CLERK TO HAVE THE DEDUCTION STOPPED." R. at 23. The Auditor thus refused to honor the wage assignments. This policy has continued under Connie Nass, the current State Auditor.

Joining the Governor as a necessary party under Ind. Trial Rule 19, on May 8, 1998, the Unions filed a complaint for mandate seeking to compel the Auditor to process the wage assignments. The Unions also sought damages on its mandate action. In addition, the Unions filed a request for declaratory judgment asking the court to declare that the fair share provision in the Settlements was lawful and thus entitled to enforcement. Thereafter the Unions filed a motion for partial summary judgment reserving only the issue of damages. The Auditor filed a cross motion for summary judgment. After a hearing, the trial court granted the Unions' motion and entered judgment mandating the Auditor to process voluntary wage assignments from State employees who are subject to the Settlements. The trial court also declared that the fair share provision contained in the Settlements is legal and enforceable. This appeal followed.

## Discussion

### I. Resolving this Case on its Merits

■ We first address a procedural issue. This appeal is prosecuted as one of right based on Ind. Appellate Rule 4(B)(1).[3] The Auditor relies upon this provision because the issue of damages has not yet been resolved. As a result, the judgment before us is not final and may be pursued only as an interlocutory appeal. *Troyer v. Troyer*, 686 N.E.2d 421, 424 (Ind.Ct.App.1997) (When less than all of the parties' claims, rights, and liabilities have been adjudicated, then the order or

---

2. A fair share provision defines the pro rata costs of the union's services rather than union dues. This fee can be more or less than dues. The fair share arrangement compensates the union for providing full and equal protection to all employees in the bargaining unit, regardless of union membership status. *Fort Wayne Education Ass'n, Inc. v. Goetz*, 443 N.E.2d 364, 368 n. 1 (Ind.Ct.App.1982).

3. The Rule provides in pertinent part "appeal from interlocutory orders shall be taken to the Court of Appeals in the following cases: (1) For the payment of money or to compel the execution of any instrument or writing, or the delivery or assignment of any securities, evidence of debt, documents or things in action." App. R. 4(B)(1).

judgment is interlocutory.). The authority to pursue an interlocutory appeal before this court is controlled by Ind. Appellate Rule 4(B). Only Rules 4(B)(6) and (4)(B)(1) are potentially applicable here. Rule (4)(B)(6) requires trial court certification. The Auditor did not seek certification and accordingly the trial court did not enter an order of certification. Thus, unless Rule 4(B)(1) applies to the facts of this case, then this appeal is not properly before us.

Matters that are appealable as of right under App. Rule 4(B)(1) involve trial court orders which carry financial and legal consequences akin to those more typically found in final judgments such as payment of money, delivery of securities and so on. *Cua v. Morrison*, 600 N.E.2d 951, 952 (Ind.Ct.App.1992). However, our research reveals no Indiana authority where this proposition has been explored in the context of a party having no legal or pecuniary interest in the money ordered to be paid. In this case, the Auditor concedes that she has "no ultimate interest in whether the employees receive these funds as salary, or whether, on proper wage assignments, they are distributed to the Relator Unions in order to satisfy the employee's obligation to pay fair share." Reply Brief of Appellant at 3. Absent such interest we are reluctant to declare that a party may avail itself of App. R. 4(B)(1). However we need not explore that issue today. Even if the Auditor's appeal is not properly before us, we have "declined to dismiss improperly brought appeals and retained jurisdiction of the appeal under [Ind. Appellate Rule] 4(E) in cases of a significant public interest and where the same issue would be raised in a new appeal." *Northwestern Mut. Life Ins. Co. v. Stinnett*, 698 N.E.2d 339, 341 (Ind.Ct.App. 1998). This is a case of significant public interest the merits of which would again be raised in a subsequent appeal. Accordingly we exercise our discretion to decide this case on its merits.

## II. The Governor's Authority

The Auditor contends the Governor lacked authority to enter into Settlements with the Unions, and thus the fair share provision incorporated into the Settlements are invalid as a matter of law. More specifically the Auditor contends "the Governor is without authority to engage in collective bargaining without an enabling statute." Brief of Appellant at 27. In support of her argument the Auditor cites *Rice, Auditor of State v. State ex rel. Drapier*, 95 Ind. 33, 44 (1884) in which the court held:

> [S]ince a State can not be sued in its own courts without its own legally expressed consent, the remedy by mandamus is not to be extended so as to become in effect a process against the State for the establishment of demands of an unliquidated nature, which properly fall within the cognizance of the Legislature.

The Auditor interprets this quote as standing for the proposition that the Legislature must authorize the Governor to enter Settlements with the Unions. The argument continues that because no such authorization was given, the Governor acted without authority, and the resulting contracts are unenforceable against the State in general and the Auditor specifically.

Neither the quoted language nor the case itself stands for the proposition the Auditor advances. *Rice* involved an order of mandate directing the State Auditor to pay a claim owed to William Drapier who had been employed by the Indiana Senate and House of Representatives to report the debates, votes, and proceedings. Responding to Drapier's invoice for services the Senate passed a resolution ordering the Auditor of State to draw a warrant in Drapier's favor. Examining applicable statutes for the payment of claims against the State, the court noted "[a]fter all that has been said, a single proposition may seemingly be accepted as decisive of this cause, and that is, can a simple resolution of the Senate be made to amend, modify or

vary the operation of a regularly enacted statute?" *Id.* at 47. The court answered the question in the negative and concluded the trial court erred in issuing the writ of mandate. Here, contrary to the Auditor's contention, *Rice* has no bearing on the facts of this case. And other than *Rice,* the Auditor cites no authority to support her contention that the Governor is without authority to engage in collective bargaining without specific enabling legislation.

As a technical point we first observe there is nothing in the record before us demonstrating that the Governor engaged in collective bargaining. The record shows the labor settlement agreements were negotiated by executive branch department heads and thereafter approved by the Governor. On this record the Governor's involvement was restricted to issuing an executive order that provided a framework by which collective bargaining could take place. Thus, the subsequent collective bargaining occurred not between the Governor and the Unions, but rather between executive branch department heads and the Unions. It is true, executive branch personnel act at the Governor's behest, and in that sense it may be argued the Governor engaged in collective bargaining at least by proxy. Indeed it is through executive branch personnel that the State's chief executive ensures that the business of the State is properly transacted. In any event, whether characterized as the Governor engaging in collective bargaining or approving a collective bargaining agreement negotiated by executive branch personnel, the critical inquiry in this case is whether the Governor possessed the authority to issue an executive order which set into motion the bargaining that ultimately took place.

■ In general an executive order is a command or direction issued by the "President of the United States or the chief executive officer of a State that has the force of law and that is promulgated in accordance with applicable law." 42 U.S.C. § 14616 (defining an executive order in the context of public health and welfare). An executive order must fall within the authority granted to the Governor by the constitution or statutory provision. 81A C.J.S. § *States* 130 (1977). The question presented is whether the executive order at issue in this case either implemented or gave administrative effect to a provision of Indiana's Constitution or a statutory enactment.

■ As with most other jurisdictions, in Indiana the executive power of the state is vested in the Governor. Ind. Const. art. 5, § 1. In turn, executive power is the "power to execute the laws, to carry them into effect as distinguished from the power to make the laws and the power to judge them." *Tucker v. State,* 218 Ind. 614, 670, 35 N.E.2d 270, 291 (1941). Although it is intuitive, by express legislation the Governor has the responsibility of ensuring the efficient operation of the executive branch of government. Ind.Code § 4-3-6-3 provides in part that the Governor shall reexamine from time to time the organization of all agencies of State government and determine what changes are necessary to accomplish various purposes including "to promote the better execution of the laws, the more effective management of the executive and administrative branch of the government and of its agencies and functions, and expeditious administration of the public business." In turn, the Governor's authority to regulate the terms and conditions of employment for executive branch employees is inherent in a number of statutes. *See, e.g.,* Ind.Code § 4-15-2-11 (pay plan for State employees recommended by the director of State personnel, approved by the State Budget Agency, and accepted by the Governor); Ind.Code § 5-10.1-2.5-2 (giving Governor authority to establish a sick pay plan for state employees); Ind.Code § 5-10-6-1 (hourly State employees may be granted vacation pay and paid holidays by executive order of the Governor). We conclude that the executive order in this case is a reasonable

exercise of the Governor's responsibility for the efficient operations of the executive branch of government. The order was within the broad authority granted the Governor by article 5, section 1 of the Indiana Constitution and gave effect to various statutory enactments. In turn, the Settlements, which are an outgrowth of the order, gave effect to the order itself. Contrary to the Auditor's contention no further legislation is required. We find support for this conclusion in the case of *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). In the context of a Presidential executive order establishing a labor-management relations system for federal employees, the Supreme Court observed "Executive Order [11,491] is plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch." 418 U.S. at 274 n. 5, 94 S.Ct. at 2776 n. 5 (concerning an order giving federal employees "the right, freely and without fear of penalty or reprisal, to form, join, and assist a labor organization or to refrain from any such activity, and each employee shall be protected in the exercise of this right.").

### III. The Legality of the Fair Share Provision

▮ Our conclusion notwithstanding, the question remains whether the fair share provision contained in the Settlement is legal and enforceable. Under the express terms of the provision all fair share fees collected from non-union members will be held in escrow "until it is determined by a court of general jurisdiction that this fair share provision is lawful." R. at 44, 102. In addition to their complaint for mandate, the Unions also sought declaratory judgment on this issue. Upon cross motions for summary judgment, the trial court declared the fair share provision lawful and enforceable.

▮ Our standard of reviewing the grant of summary judgment is well-set-tled: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Landmark Health Care Assocs., L.P. v. Bradbury,* 671 N.E.2d 113, 116 (Ind. 1996). Summary judgment should be granted only if the evidence sanctioned by Ind. Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The burden is on the moving party to prove there are no genuine issues of material fact and he deserves judgment as a matter of law. *Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 222 (Ind. Ct.App.1997). In this case, the trial court entered findings of fact and conclusions of law. Although findings aid appellate review, they are not binding on this court. *Id.* at 222–23. Rather, we stand in the shoes of the trial court. We will not reweigh the evidence but will consider the facts in the light most favorable to the nonmoving party. *Id.* We may affirm the grant of summary judgment on any theory or basis found in the material designated to the trial court. T.R. 56(C); *Estate of Miller v. City of Hammond,* 691 N.E.2d 1310, 1311 (Ind.Ct.App.1998), *trans. denied.*

▮ The power of the trial court to render declaratory relief is set forth in the Uniform Declaratory Judgment Act, Ind. Code § 34-4-10-1, *et seq.* (the "UDJA"). In order to obtain declaratory relief, the person bringing the action must have a substantial present interest in the relief sought. *Town of Munster v. Hluska,* 646 N.E.2d 1009, 1012 (Ind.Ct.App.1995). By the same token there must be someone having a real interest in the relief sought who may oppose the declaration. Opposition to a plaintiff seeking declaratory relief must come from a source legally competent to jeopardize the plaintiff's rights. Stated differently "[t]he basis of jurisdiction under the UDJA is 'a justiciable controversy or question, which is clearly defined and affects the legal right, the legal statuses, or the legal relationships of *the*

*parties having adverse legal interests.'"* *Indiana Wholesale Wine & Liquor Co., Inc. v. State ex. rel. Indiana Alcoholic Beverage Comm'n,* 662 N.E.2d 950, 955 (Ind.Ct.App.1996) (quoting *Indiana Alcoholic Beverage Comm'n v. Deets,* 133 Ind. App. 444, 449–50, 179 N.E.2d 217, 220 (Ind.Ct.App.1962) (emphasis added)), *aff'd in part, rev'd in part,* 695 N.E.2d 99, 103 (1998).

In the case before us, the Auditor, the person named as the opponent to the Unions' complaint for declaratory relief, has no real interest adverse or otherwise in whether the fair share provision is legal.[4] Indeed the legality of the provision itself has no bearing on the critical issue here, namely: whether the Auditor is bound to honor voluntary wage assignments. Rather, the persons whose interests are directly affected by a declaration that the fair provision is legal are the non-union members from whose wages fair share fees are being deducted. ·Non-union members have not been joined as parties to this action.[5] The importance of parties with adverse interests appearing on either side of an action for declaratory judgment seeking to declare the legality of a fair share provision cannot be overstated. For example, fair share provisions in general are valid in this jurisdiction. *See, e.g., Fort Wayne Educ. Ass'n, Inc. v. Goetz,* 443 N.E.2d 364, 369 (Ind.Ct.App.1982) (recognizing fair share agreements help ameliorate the problem of "free riders," that is, those workers who are not members of a union yet reap the benefits of union representation). However, not all fair share provisions are created equal. *See, e.g., Anderson v. East Allen Educ. Assoc.,* 683 N.E.2d 1355, 1357 (Ind.Ct.App.1997) (holding that a fair share provision violated the First Amendment because it set a fee without establishing a method to ensure funds would not be used for activities unrelated to collective bargaining; and that setting the fair share fee at the amount of full union dues presumptively charged nonmembers for political and ideological activities); *Ford v. Madison–Grant Teachers Ass'n,* 675 N.E.2d 734, (Ind.Ct.App. 1997) (finding that a procedure must be in place which ensures that fair share funds collected from non-union members will not be used, even temporarily, for ideological activities); *Albro v. Indianapolis Educ. Ass'n,* 585 N.E.2d 666, 669 (Ind.Ct.App. 1992), *adopted on transfer,* 594 N.E.2d 781 (Ind.1992), *reh'g denied* (holding that the IEA failed to sustain its burden of affirmatively proving the ratio of its chargeable expenses to nonchargeable expenses in establishing a fair share percentage by demonstrating a methodology which simply proves nonchargeable expenses).

■ Among other things, a union carries the burden of showing that it has used the appropriate methodology in setting a fair share fee. *Flosenzier v. John Glenn Education Ass'n,* 656 N.E.2d 864, 867 (Ind.Ct.App.1995). For example, a union carries the burden of demonstrating the amount of the fair share fee, and it does so by establishing the ratio of chargeable expenses to total expenses. Once established, the ratio, expressed as a percentage, is multiplied by the amount of a union member's dues to determine a non-union member's fair share fee. *Id.* In the case before us, the Settlements provide in part that the amount of a non-union members fair share fee will not exceed 85% of the dues paid by Union members and that the

---

4. This point is amplified in the Auditor's brief. "The Auditor has no stake in the outcome because no state funds are at issue. She is not one of the State employees who may be legally obligated to pay fair share Union dues." Brief of Appellant at 25.

5. We acknowledge that despite language in the UDJA suggesting otherwise, the failure to join all parties who have a claim or interest which would be affected by declaratory relief does not deprive the court of subject matter jurisdiction over the case. *See Harp v. Ind. Dept. Of Highways,* 585 N.E.2d 652 (Ind.Ct. App.1992); *State ex rel. City of Indianapolis v. Brennan,* 231 Ind. 492, 499, 109 N.E.2d 409, 412 (1952). The issue here however does not concern subject matter jurisdiction.

amounts required of non-union members shall not include fees, charges, and assessments involving political contributions. R. at 44, 102. However, nothing in the record shows that the fees will not be used for ideological activities. *See Albro,* 585 N.E.2d at 670. And nothing in the record shows how the Unions arrived at the 85% figure. *See Flosenzier,* 656 N.E.2d at 869. In the context of their motion for summary judgment, the Unions have not demonstrated they are entitled to judgment on this issue as a matter of law. More importantly for our purposes here, lacking any interest in the fair share fees or how they may have been calculated, the Auditor did not challenge the Unions' Rule 56 materials on this point or attempt to put the Unions to their proof. In essence, the Unions and the Auditor did not have sufficient adverse legal interests regarding the fair share provision. Accordingly, the trial court erred by granting summary judgment in favor of the Unions declaring the fair share provision legal and enforceable. On this issue the judgment of the trial court is reversed.

### IV. Voluntary Wage Assignments and Statutory Authorization

 The Auditor argues she has no legal duty to honor the wage assignments in this case because they are not authorized under Ind.Code § 22–2–6–2. Thus, the argument continues, the wage assignments are not valid and the order of mandate is erroneous. An action for mandate is an extraordinary remedy of an equitable nature which is generally viewed with disfavor. *State ex rel. Woodford v. Marion Superior Court,* 655 N.E.2d 63, 65 (Ind. 1995). "Mandamus does not lie unless the petitioner has a clear and unquestioned right to relief and the respondent has failed to perform a clear, absolute, and imperative duty imposed by law." *Yater v. Hancock County Bd. of Health,* 677 N.E.2d 526, 528 (Ind.Ct.App.1997), *reh'g denied.* A judgment granting a party's request for mandate will be reversed only when the evidence reveals no conflict and

points unerringly to the opposite conclusion. *Id.* "An action for mandate may be prosecuted against any inferior tribunal corporation, public or corporate officer, or person to compel the performance of any: (1) act that the law specifically requires; or (2) duty resulting from any office, trust, or station." Ind.Code § 34–27–3–1.

One of the Auditor's statutory duties includes drawing warrants on the treasury of the state directing her to pay funds out of the treasury to "public officers or for *any other object* as the warrants become payable." Ind.Code § 4–7–1–2(8) (emphasis added). The Auditor acknowledges the foregoing statute requires her to make certain payments but contends that at most she can only be required to honor valid wage assignments. According to the Auditor those at issue in this case are not valid. Ind.Code § 22–2–6–2 dictates that a wage assignment is valid provided specific content and formalistic requirements are met and is made to pay one of eleven listed purposes, including:

> (5) Dues to become owing by the employee to a labor organization of which the employee is a member.
>
> . . . .
>
> (9) Payment to any credit union, nonprofit organization, or association of employees of such employer organized under any law of this state or of the United States.

Ind.Code § 22–2–6–2(b). The Auditor does not challenge the content or formal structure of the wage assignments here. By statute the assignments must be in writing, signed by the employee personally, and are revocable at any time by the employee upon written notice. Ind.Code § 22–2–6–2(a). Rather, the Auditor argues that because section (b)(5) specifically addresses labor unions and makes an assignment of wages valid only for union member employees, section (b)(9) cannot be interpreted also to include labor unions which would allow an assignment of wages for non-union member employees. The

Auditor insists "[o]bviously, the legislature decided to deal with unions in section (5), and all other employee organizations in section (9)." Brief of Appellant at 21.

■■■■ When reviewing a statute our main objective is to ascertain and implement the intent of the legislature. *State Employees' Appeals Comm'n v. Barclay,* 695 N.E.2d 957, 961 (Ind.Ct.App.1998), *trans. denied.* To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. *Murray v. Hamilton County Sheriff's Dep't,* 690 N.E.2d 335, 339 (Ind.Ct.App.1997). We are required to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience. *In re E.I.,* 653 N.E.2d 503, 507 (Ind.Ct. App.1995). In doing so, this court should consider the objects and purposes of the statute, as well as the effect and consequences of such an interpretation. *State v. Windy City Fireworks, Inc.,* 600 N.E.2d 555, 558 (Ind.Ct.App.1992), *adopted on transfer* 608 N.E.2d 699 (Ind.1993).

■■■■ We disagree with the Auditor's reading of the statute. Although section (b)(5) "deals" with unions, that does not compel a conclusion that unions are thereby excluded from section (b)(9). Among other things, (b)(9) concerns any association of employees "organized under any law of this state or of the United States." *Id.* There is no question that AFSCME and the Unity Team, although unions, are certainly associations of employees organized pursuant to federal and state law. Thus we see no reason why they would not be included within the ambit of section (b)(9). Further, section (b)(9) specifically refers to wage assignments for "payments" to associations of employees. By contrast section (b)(5) refers to wage assignments for "dues." Fair share fees, which are the

subject of the assignments at issue in this case, are not dues within the meaning of the statute. *See supra* note 2. Rather, they can only be considered "payments" as the term is used in section (b)(9). In essence our reading of Ind.Code § 22–2–6–2 leads us to conclude the Legislature intended that an employee may voluntary assign her wages to an association of employees for the payment of fair share fees. Accordingly, assuming the content and formalistic requirements are otherwise satisfied, the Auditor is bound to honor such wage assignments.[6]

## Conclusion

The executive order in this case and the resultant Settlements represent a reasonable exercise of the Governor's responsibility for the efficient operations of the executive branch of government. There is no error on this issue. Nor did the trial court err in mandating the Auditor to honor voluntary wage assignments. However, the trial court did err by granting summary judgment in favor of the Unions, declaring the fair share provision legal and enforceable. Accordingly the judgment of the trial court is affirmed in part and reversed in part. The cause is remanded for further proceedings.

Judgment affirmed in part and reversed in part.

BROOK, J., and BAKER, J., concur.

---

**6.** In this regard we reject the Auditor's inference that the trial court's order of mandate removes her discretion to determine whether the wage assignments are indeed valid. Nei-

ther the order of mandate nor our opinion today restricts the Auditor from conducting an appropriate inquiry to determine whether the statutory requirements have been met.