Vernon GRAVES and Shirley
F. Graves, Appellants–
Plaintiffs,

v.

John Marvin JOHNSON, Jr., Tamara
Renee Lynn Johnson and Westport In-
surance Company, Appellees–Defen-
dants.

No. 34A02–0607–CV–563.

Court of Appeals of Indiana.

March 16, 2007.

Jeffrey M. Miller, Noel & Sullivan, Ko-
komo, IN, Attorney for Appellant.

Dennis F. Cantrell, Karl L. Mulvaney,
Kent D. Zepick, Bingham McHale LLP,
Indianapolis, IN, Attorneys for Appellee.

**OPINION**

DARDEN, Judge.

*STATEMENT OF THE CASE*

Vernon and Shirley Graves appeal the
trial court's entry of summary judgment in
favor of Westport Insurance Company
("Westport").

We affirm.

*ISSUE*

Whether the trial court erred in grant-
ing Westport's motion for summary judg-
ment.

*FACTS*

The Graveses owned property, including
a building and improvements (the "Proper-
ty"), located in Kokomo. The Graveses
leased the Property to John and Tamara
Johnson, who operated their business,

Johnson's Towing & Recovery ("Johnson's Towing"), on the Property. The Johnsons insured their business interest through Westport, with Johnson's Towing as the named insured. The insurance policy included commercial property, including the building located on the Property, and general liability coverage. The insurance policy contained the following provision:

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost of damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property ...;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality....

(App.84).

On or about November 13, 2003, a fire destroyed the building and other improvements located on the Property. Westport hired Claims Management Services, Inc. ("CMS") to investigate and adjust the Johnsons' claim. CMS hired Robert J. Davis to serve as its local adjuster. As the adjuster, Davis "was charged with meeting with the insured, ... accessing [sic] the damage, calculating an estimate for repair, and reaching an agreed price for repair ... with the contractor of the insured's choosing." (App.194).

Subsequently, Davis met with Vernon, who was acting as the contractor in charge of rebuilding the Property's building. Of the $126,000 that Vernon estimated it would cost to rebuild, Davis agreed that Westport would pay $98,000 pursuant to the insurance policy owned by the Johnsons, with Vernon's insurer paying the remainder. "Davis agreed to make three (3) progress payments to [Vernon][.]" (App. 214).

On December 15, 2003, Westport sent a letter to Johnson's Towing and copied Vernon on the letter. The letter provided, in pertinent part, as follows:

We have now established that Mr. Vernon Graves is the owner of this building/premises, but he has not been listed as an additional insured under your property policy. The following excerpt from your property policy sets out the conditions of payment when loss or damage occurs.

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost of damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property ...;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality....

After conferring with an insurance attorney, we have decided to proceed under **Paragraph 4.a. (2) of the Loss Payment section of the Policy.** We have decided to proceed in this manner because your financial interest in the Covered Property is limited to the value of your leasehold interest in the property.

Accordingly, we will pay for the cost of repairing/replacing the structure. We will make the payments under the Policy in the form of progress payments payable to you and the contractor that you select to perform the work. These payments would be distributed as co-payable installments, as each stage is completed.... [Westport] will not pay you

directly for the damages sustained to the building, as you are not the owner.

(App.191–92).

On or about January 20, 2004, Westport issued a check in the amount of $30,000. Westport made the check payable to Johnson's Towing *and* Vernon and "delivered [the check] directly to [Vernon]." (App. 215). Vernon voiced no objection and deposited the check into his account on or about February 5, 2004. "Thereafter, [Vernon] was paid $29,000 additional dollars for a subsequent progress payment." (App.214).

On or about February 17, 2004, Westport issued a check (the "Check"), made payable to Johnson's Towing *and* Vernon in the amount of $68,037.42, and tendered it to Johnson's Towing. The Johnsons allegedly forged Vernon's endorsement of the Check and either cashed or deposited the Check, failing to tender to Vernon the $38,178.23 due for construction costs.

On April 11, 2005, the Graveses filed a complaint against the Johnsons[1] and Westport. The complaint alleged the following against Westport:

15. At all times relevant hereto, [Davis] acted as adjustor and agent for [Westport].

16. At all times relevant hereto, Westport insured the premises . . . against fire and other casualties on behalf of [the Johnsons], d/b/a Johnson's Towing. . . .

17. After the casualty loss, Westport entered into negotiations with [the Graveses], as owners of the subject property, for adjustment of the loss and payment for repair of the premises.

18. Westport agreed to pay the [Graveses] the sum of $98,000.00 of policy proceeds for repair of the premises.

19. Of said sum, $38,178.23 remains unpaid.

(App.17–18). The Graveses sought judgment against Westport for the $38,178.23. Westport asserted as an affirmative defense that the Graveses' claim against it was "barred or reduced by payment." (App.34).

On October 26, 2005, Westport filed its motion for summary judgment and designated the following evidence: 1) the policy insuring Johnson's Towing; 2) the affidavit of Heather Holden, a claims adjuster for CMS; 3) the affidavit of Davis; 4) a copy of the letter dated December 15, 2003 and sent to Vernon and Johnson's Towing; 5) the first check tendered to Vernon; and 6) the Check. Westport asserted that

Westport discharged its obligations to the Graves[es] once the Check was tendered to one of the co-payees, Johnson's Towing, endorsed with the signatures of Johnson's Towing and V. Graves, presented for payment by Johnson's Towing and honored and paid by the bank.

(App.45). In support, Westport cited Indiana Code section 26–1–3.1–310(b)(1), which provides in relevant part as follows:

[I]f a note or uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:

. . . In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certifica-

---

1. The Johnsons filed for bankruptcy under Chapter 7 of Title 11 of the United States Bankruptcy Code on October 15, 2005, thereby automatically staying the Graveses' action against the Johnsons.

tion of the check results in discharge of the obligation to the extent of the amount of the check.

Westport argued that it was "not liable for the Graves[es]' failure to receive the money from the Check." (App.45).

The Graveses filed their response to Westport's motion for summary judgment on April 11, 2006. The Graveses designated as evidence the affidavit of Vernon. The Graveses argued that "[w]hether [the Graveses] had a direct contract with [Westport]" and "[w]hether delivery of a check to a third party constitute[d] payment under said contract," precluded the granting of Westport's motion for summary judgment. (App.210).

On May 10, 2006, Westport filed its reply, asserting that the Graveses' "designation of facts ... are not materially different than Westport's and do not create a question of fact that would preclude the entry of summary judgment on Westport's motion." (App.228).

Following a hearing on June 5, 2006, the trial court granted Westport's motion for summary judgment. Additional facts will be provided as necessary.

### DECISION

When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Landmark Health Care Assocs., L.P. v. Bradbury,* 671 N.E.2d 113, 116 (Ind.1996). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. Ind. T.R. 56(C); *Blake v. Calumet Const. Corp.,* 674 N.E.2d 167, 169 (Ind.1996). For sum-

mary judgment purposes, a fact is "material" if it bears on ultimate resolution of relevant issues. *Kreighbaum v. First Nat'l Bank & Trust,* 776 N.E.2d 413, 419 (Ind.Ct.App.2002). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct. App.1991). Once the movant has carried his initial burden of going forward under Trial Rule 56(C), the nonmovant must come forward with sufficient evidence demonstrating the existence of genuine factual issues, which should be resolved at trial. *Otto v. Park Garden Assocs.,* 612 N.E.2d 135, 138 (Ind.Ct.App.1993), *trans. denied.* If the nonmovant fails to meet his burden, and the law is with the movant, summary judgment should be granted. *Id.*

The Graveses contend that summary judgment was improper because the designated evidence creates genuine issues of fact for trial, namely, "whether Westport's method of payment was agreed to by [Vernon]," and whether Vernon agreed to "payment by co-payable check." Graveses' Br. 10. We disagree.

In his affidavit, Davis averred to the following:

> 5. I was able to reach an agreed price for repair with the contractor, [Vernon].
>
> 6. I never agreed, on behalf of Westport, to pay the Graves[es] the insurance proceeds.
>
> 7. I merely negotiated with [Vernon] as to the cost of repair....
>
> 8. [Vernon], the owner of the [P]roperty and the general contractor performing the repairs, wanted the insurance proceeds paid directly to him.

* * *

11. I ... informed [Vernon] that he was not entitled to the proceeds directly from Westport since he was not an insured, loss payee or named additional insured on the insurance policy.

12. I informed [Vernon] that Johnson's Towing had to be named on the proceeds checks as co-payees since it was Westport's insured.

(App.194–95). Furthermore, Holden, in her affidavit, declared that "CMS agreed to make the progress payments co-payable to both Johnson's Towing and the contractor of Johnson's Towing's choosing as indicated in [her] letter to Johnson's Towing and [Vernon] dated December 15, 2003." (App.185). Westport designated the December 15 letter as evidence.

In his affidavit, Vernon declared, in pertinent part, as follows:

9 .... Davis, on behalf of Westport, then agreed to pay me said $98,000 and hired me, as a general contractor....

10. Davis agreed to make three (3) progress payments to me in the total sum of $98,000, which he agreed to pay based upon receipts and other documentation for all work and labor done.

11. Thereupon, Davis, on behalf of Westport, paid me $30,000 on account of the construction contract.

* * *

16. Despite demand, Westport has failed and refused to pay the balance of the contract in the amount of $38,178.23.

17. At all times relevant hereto, I had direct contact with Westport by and through their agent, Davis, and contracted directly with them for rebuilding at a fixed price. Westport directly agreed with me to pay said price.

* * *

19. At all times, Davis, on behalf of Westport, directly negotiated with me concerning construction and costs. The check payable for the first draw was delivered directly to me.

20. Checks for subsequent draws were not delivered to me and at no time did I receive or accept a check for subsequent draws.[2]

21. The check for third and final payment was not delivered to me nor did I receive or accept it.

22. At no time did I agree that payment to any third party would constitute payment to me on the aforesaid contract.

23. At no time did I designate [the Johnsons] as my agent for the receipt of funds.

24. At no time did I agree the payment to anyone other than me would discharge the obligation under my direct contract with Westport.

25. As distinguished from the check for the previous progress payment, I never received or had possession and control of the check containing the $38,000 shortfall.

(App.214–15).

■ As to method of payment, there is no dispute that Westport agreed to make progress payments to Vernon and agreed to make the payments by check. Furthermore, Vernon's affidavit does not dispute that Westport informed him that any check would be made payable to Vernon and Johnson's Towing, the named insured

---

**2.** Vernon also stated in his affidavit that he "was paid $29,000 additional dollars for a subsequent progress payment." (App.214). Vernon, however, does not state whether this payment was in the form of a check from Westport, whether he was a payee or co-payee, or whether it was tendered directly to him by Westport.

on the insurance policy. Vernon made no objection to the method of payment and acquiesced to it when he took the first check.

We cannot say that Vernon's assertions that he 1) never "agree[d] that payment to any third party would constitute payment to [him]," 2) never designated the Johnsons "as [his] agents for the receipt of funds," and 3) never "agree[d] that payment to anyone other than [him] would discharge" (App.215) Westport's obligation created a genuine issue of material fact where, as here, the issue is whether "delivery of a co-payable check to Johnson['s Towing] constitutes payment and, therefore, discharges Westport of its underlying obligation." Graves' Br. 4.

We find no dispute that Westport sent the Check in accordance with the terms it set forth to the Graveses and as agreed upon by the Graveses.[3] Accordingly, we find the Graveses' argument that Westport breached its contract when it made the Check jointly payable to Johnson's Towing and Vernon unpersuasive.

The Graveses also contend that the trial court erred in granting summary judgment to Westport as a matter of law. The Graveses argue that Westport did not discharge its obligation to them because they never received or took the Check.[4] Again, we find this argument unpersuasive.

In determining whether an obligation is suspended as to all joint payees when a check is taken by one joint payee, we find *Benchmark Bank v. State Farm Lloyds*, 893 S.W.2d 649 (Tex.Ct.App.1994) instructive. In *Benchmark*, the court found that "[p]ayment to and possession by one joint payee is constructive possession by the other joint payee." 893 S.W.2d at 651. We agree and find that where one joint payee takes and possesses a check, it suspends all obligations as to other joint payees not in actual possession of the check as "[t]he party possessing the draft holds the draft for the benefit of himself and the other payee." *Id.; cf. Parke State Bank v. Akers*, 659 N.E.2d 1031, 1034 (Ind.1995) ("A party may be in constructive possession of property without having actual possession.").

Furthermore, as to the actual discharge of a debt, "[i]t is well settled in Indiana law that once a check is paid, it extinguishes the debt for which it is presented." *Indiana Ins. Co. v. Margotte*, 718 N.E.2d 1226, 1230 (Ind.Ct.App.1999); I.C. § 26–1–3.1–310(b)(1) (providing that "[p]ayment or certification of the check results in discharge of the obligation to the extent of the amount of the check"). Such debt is extinguished even where a jointly payable check is sent to one co-payee and that co-payee embezzles the funds. *See Margotte*, 718 N.E.2d at 1230;[5] *see also*

---

**3.** We note that the Graveses did not allege that Westport was negligent in delivering the Check to Johnson's Towing.

**4.** The Graveses also argue that Indiana Code section 26–1–3.1–310 does not apply because it only speaks to "an obligation, in other words a *single* obligation. Graves and Johnsons [sic] obligations were separate and distinct." Graveses' Br. 6. We note that the Graveses did not raise this issue before the trial court. Issues not raised before the trial court on summary judgment cannot be argued for the first time on appeal and are

waived. *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind.Ct.App.2004).

**5.** In *Margotte*, Indiana Insurance Company ("Indiana") and the Margottes entered into a settlement agreement, whereby Indiana agreed to pay $400,000.00 to the Margottes and their attorney, Bradley Catt. Indiana sent the jointly payable check to Catt. Subsequently, Catt forged the Margottes' endorsements and embezzled the settlement proceeds. The Margottes sued Indiana, arguing it breached the settlement agreement by sending the settlement check to Catt.

*Benchmark,* 893 S.W.2d at 651 (holding that a drawer's obligation is discharged as a matter of law where a draft, properly issued to joint payees, is delivered, honored and paid).

Affirmed.

BAKER, C.J., and ROBB, J., concur.

The Graveses argue that *Margotte* is distinguishable from case because the "method of payment was agreed to by the" Margottes, and "[Catt] was the agent and attorney for the client," and "[n]o such relationship exists here." Graveses' Br. 7. As stated, the Graveses acquiesced to Westport's method of payment. Furthermore, this Court relied on Indiana Code section 26–1–3.1–310 in finding that payment of the settlement check extinguished Indiana's obligation and did not limit its holding to those cases involving an attorney-client relationship.