**In the Matter of ANONYMOUS.**

Nos. 45S00–9305–DI–523,
71S00–9406–DI–533.

Supreme Court of Indiana.

Sept. 8, 1995.

## DISCIPLINARY ACTION

### PER CURIAM.

The Disciplinary Commission filed two verified complaints for disciplinary action in separate, unrelated cases alleging similar violations of the *Rules of Professional Conduct*

*for Attorneys at Law.* We now find that the respondent in each case engaged in misconduct as charged and that a private reprimand is the appropriate disciplinary sanction in each case. Given our desire to educate the Bar and the similarity of the cases presented, we herein more fully set forth the facts and circumstances of each case while preserving the confidential nature of the discipline.

### I

■■■ In the first case, the Commission alleged that the respondent violated Ind.Professional Conduct Rules 1.7 [1] and 1.9(a) [2] by undertaking impermissible serial representations. This Court appointed a hearing officer pursuant to Ind.Admission and Discipline Rule 23, Section 11, who, after full hearing, tendered her findings of fact and conclusions of law, therein concluding that the respondent engaged in misconduct and recommending a private reprimand. Both the Commission and the respondent have petitioned this Court for review of the hearing officer's report. The Commission asks this Court to review only the hearing officer's recommended sanction. The respondent challenges certain factual findings and legal conclusions of the hearing officer. This Court is not bound by the report of hearing officer, although, since it is a product of direct observation of witnesses, we will give it appropriate emphasis. *In re Gemmer* (1991), Ind., 566 N.E.2d 528. Our review of disciplinary cases is *de novo* and entails an examination of the entire record submitted. *In re Blackwelder* (1993), Ind., 615 N.E.2d 106. Misconduct must be proven by clear and convincing evidence. Admis.Disc.R. 23(14)(f). The peti-

1. Professional Conduct Rule 1.7 provides:

 (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
 (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
 (2) each client consents after consultation.
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

2. Professional Conduct Rule 1.9(a) provides:
 A lawyer who has formerly represented a client in a matter shall not thereafter:
 (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation;
 . . .

tions for review will be addressed within the context of this review process.

We now find that, in 1988, respondent was a member of a law firm. Late that year, a company (the "company") retained the respondent to defend it against certain grievances initiated by a labor union (the "union"). The union alleged that the company failed to properly contribute funds pursuant to a collective bargaining agreement. Specifically, the respondent was retained to represent the company regarding several issues between the two parties that were to be arbitrated. Both parties recognized that an individual holding the position of trustee and financial secretary of the union (the "trustee") was a key witness, since he negotiated the collective bargaining agreement between the company and the union. The respondent met with the trustee on December 22, 1988, as well as on several other occasions in late 1988, and discussed the pending grievances. At a deposition, the trustee testified that he informed the company it would not have to contribute funds pursuant to the agreement. He was effectively discharged as a trustee of the union in late 1988, apparently due to the union's perception that he provided certain information detrimental to its position in the grievance litigation. He formally resigned from his elected position of financial secretary in February, 1989.

At hearing of this matter, the trustee testified that, on December 22, 1988, he met with an attorney in the respondent's firm to inquire about representation in a wrongful discharge suit he intended to file against the union. The trustee was referred to the respondent because the respondent handled the bulk of the firm's labor matters. The respondent and the trustee met later that day, and, in addition to discussing the upcoming labor grievance proceedings, discussed the trustee's termination from his positions at the union and the possibility of filing a lawsuit against the union's president for wrongful termination. The respondent gave the trustee a document regarding RICO actions and assisted him in revising a statement the trustee planned to deliver to union members.

On December 27, 1988, the respondent's law firm opened a client file for the trustee. The file jacket indicated that the firm represented him. A code on the file reflected the respondent's having opened the file. The respondent and the trustee subsequently met two more times. The trustee testified that, at one such meeting, they discussed a possible contingency fee arrangement. The trustee testified that the respondent told him he thought his case may have been worth one million dollars. In addition, the trustee sent the respondent audio tapes of his recollection of the events surrounding his termination from the union, and wrote at least five letters to the respondent. These materials were placed in the trustee's file. On March 17, 1989, the respondent posted a billing slip to the file, memorializing a March 17, 1989 meeting between them. The respondent and the trustee never entered a formal employment agreement. The respondent never billed the trustee, nor did he ever expressly accept employment as the trustee's attorney.

The respondent ceased employment with the law firm in May, 1989, and began practicing law in another office nearby. Upon learning that the respondent no longer was associated with the firm, the trustee retrieved his case file from the firm's offices, believing that he was the respondent's client. However, the trustee never delivered his file to the respondent's new office, nor did he thereafter communicate directly with the respondent regarding his case. In 1990, the union settled its dispute with the company. Despite the meetings between the respondent and the trustee, the respondent did not use the trustee as a witness in the grievance proceedings.

On May 3, 1990, the respondent filed a fraud action on behalf of the company against the trustee and others, alleging that the trustee had fraudulently represented to the company that it would not have to contribute to the union's benefit plan. The respondent moved to withdraw his appearance on July 25, 1991 because of the appearance of impropriety.

In his petition for review, the respondent contends that the hearing officer erroneously concluded that the trustee and the respon-

dent formed an attorney-client relationship. He argues that no such relationship was ever formed between them, and thus that no conflict could have arisen. Specifically, the respondent asserts that he met with the trustee solely because the trustee was the "key witness" in the labor grievance. He claims that he met with the trustee in late 1988 only to go over his testimony for the grievance proceedings and not to discuss the trustee's employment problems. The respondent claims indicia of an attorney-client relationship are lacking and that the trustee did not even have a legal basis for a wrongful discharge suit.

■ Creation of an attorney-client relationship is not dependent upon the formal signing of an employment agreement or upon the payment of attorney fees. An attorney-client relationship need not be express, but may be implied by the conduct of the parties. *Hacker v. Holland* (1991), Ind.App., 570 N.E.2d 951, 955. Such a relationship exists "only after both attorney and client have consented to its formation." *Id.*

■ Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance. *Bays v. Theran* (1994), 418 Mass. 685, 639 N.E.2d 720; *McVaney v. Baird, Holm, McEachen, Pedersen, Hamann & Strasheim* (1991), 237 Neb. 451, 466 N.W.2d 499; *Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Wunschel* (1990), Iowa, 461 N.W.2d 840. *See also People v. Morley* (1986), Colo., 725 P.2d 510 (the relationship may be established when it is shown that the client seeks and receives the advice of the

attorney on the legal consequences of the client's past or contemplated actions). An important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice. *Dalrymple v. National Bank & Trust Co. of Traverse City* (1985), D.C.Mich., 615 F.Supp. 979, *citing Westinghouse Electric Corp. v. Kerr–McGee Corp.* (1978), 7th Cir., 580 F.2d 1311, *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346. *See also People v. Bennett* (1991), Colo., 810 P.2d 661 (the proper test is subjective; an important factor is whether the client believed the relationship existed); *State v. Hansen* (1993), 122 Wash.2d 712, 720, 862 P.2d 117 (client's belief will control where it is reasonably formed based on attending circumstances, including attorney's words and actions); *In re Johore Investment Co. (U.S.A.), Inc.* (1985), D.Hawaii, 157 B.R. 671 (in the preliminary consultation context, the existence of the relationship rests upon the client's belief that he is consulting the lawyer in a professional capacity and his manifested intention to seek legal advice).

■ The hearing officer specifically found that an attorney-client relationship was implied from the parties' conduct. There is ample evidence in the record indicating that the respondent met with the trustee on several occasions and discussed a potential wrongful termination suit, a matter within the respondent's professional competence. The trustee testified that the respondent eventually concluded that the trustee had a strong wrongful termination case. The respondent testified that he did not consider the trustee to be his client.[3] There is, however, evidence tending to establish that both the respondent and the trustee consented to formation of an attorney-client relationship.[4]

---

**3.** On cross examination by the Commission, the respondent stated:

> [The trustee's case] was an evolving process ... [he] conveyed to me that he was anticipating all kinds of horrible things happening to him, employment wise. And in the event that [he] was wrongfully discharged, I anticipated that [he] and I might undertake litigation. [He] was a prospective client, but that's all he was.... I talked to him about the possibility of a case ... Tr. at 383.

**4.** Relevant portions of the trustee's testimony reveal that both the respondent and the trustee believed they had formed an attorney-client relationship at the December 22 meeting:

> [Commission]: Okay. When you went in to meet with [the respondent], what was the topic of your conversation with him?
> [Trustee]: Well, first I asked him about the representation because that's what I was there for, and, uh, he said uh, Yes, I certainly can. He said, I'll represent you. And I had a letter—we

We are convinced that the respondent provided advice to the trustee regarding matters within his professional competence. It is clear that the trustee thought the respondent was acting as his attorney. Finally, we are also convinced that the respondent should have been aware that the trustee thought the respondent was representing him. The respondent did nothing to dispel this belief.

■ Contrary to the respondent's assertions, the existence of an attorney-client relationship is in no way dependent on the ultimate viability of potential causes of action discussed by the parties. Its existence is dependent only on the nature of the interaction between the parties and their consent, express or implied, to such a relationship.

■ The testimony of the trustee and of the respondent conflicts. The hearing officer heard this testimony at hearing, where she had the opportunity to "observe witnesses, absorb the nuances of unspoken communication, and by this process, attach credibility." *In re Cook* (1988), Ind., 526 N.E.2d 703, 706. She concluded that the parties formed an attorney-client relationship. As we stated above, the findings of the hearing officer are given appropriate emphasis. *Gemmer, supra.* In addition, our review of the record reveals ample evidence upon which a finding that the parties formed an attorney-client relationship may be based. We now find, as did the hearing officer, that the respondent and the trustee formed an attorney-client relationship during their meetings in late 1988 and early 1989. We therefore conclude that the respondent violated Prof.Cond.R. 1.7(a) by representing the trustee when that representation was directly adverse to the interests of another client, the company, where neither client consented. He violated Prof.Cond.R. 1.7(b) by representing the company in its fraud suit against the trustee, when that representation was limited by the respondent's responsibilities to the trustee, who was the respondent's client. The respondent violated Prof.Cond.R. 1.9(a) by representing the trustee and subsequently representing the company in its fraud action against the trustee without obtaining the trustee's consent.

■ Having found misconduct, we must now assess an appropriate disciplinary sanction. In so doing we examine the nature of the misconduct, the actual or potential injury flowing from the misconduct, the state of mind of the respondent, the duty of this Court to protect the integrity of the profession, and matters in mitigation and aggravation. *In re Wells* (1991), Ind., 572 N.E.2d 1290.

■ Loyalty to a client is impaired when an attorney cannot consider, recommend or carry out an appropriate course of action for the client because of responsibilities to other clients. We view the respondent's conduct here as disloyal to his clients. However, his misconduct is based on a single, isolated instance. There is no evidence he intended to violate the *Rules of Professional Conduct.* There is no evidence that his misconduct caused any real harm to either client. The respondent has never before been charged with ethical misconduct. In its petition for review, the Commission contends that several aggravating factors exist, among them the respondent's refusal to acknowledge the wrongful nature of his misconduct. We, however, prefer to apply Standard 4.34 of the American Bar Association's *Standards for Imposing Lawyer Sanctions* which states:

> Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the representation of a client will be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes little or no actual or potential injury to a client.

For these reasons, we conclude that a private reprimand is the appropriate sanction for the misconduct in this case.

had a meeting, I believe, it was that night in Countryside, and I had a statement handwritten,—my wife had written some stuff—and I wanted to—if he was going to be my counsel, have him look it over and make sure that it— that there was nothing in there that could possibly get me in trouble or anything. And uh, so after he assured me he'd be my attorney, then I went ahead and gave him this.
Tr. at 51.

## II

 In the second action now before us, the Commission and the respondent have tendered for our approval a statement of circumstances and conditional agreement for discipline pursuant to Admis.Disc.R. 23(11)(g). The respondent has provided an affidavit pursuant to Admis.Disc.R. 23(17).

Adopting the facts contained in the parties' agreement, we now find that the respondent met with an individual (the "client") in early 1987 regarding a possible personal injury action. During their meeting, which lasted at least one hour, the respondent discussed with the client such an action and reviewed some medical bills the client had brought with him. Respondent sent the client a letter dated January 13, 1987, and enclosed an original and two copies of a retainer agreement. The client signed the agreement and returned it to the respondent, along with a copy of a police accident report and some additional medical bills. He discharged the respondent the next month and picked up his file from the respondent's office in April, 1987.

The client subsequently hired another attorney ("successor counsel") to pursue his claim. On May 19, 1987, successor counsel filed a personal injury action on behalf of the client, who eventually received an unfavorable verdict following a jury trial in May, 1989. In 1991, the client, through yet another attorney, filed a malpractice action against successor counsel.

On June 5, 1991, the respondent filed an appearance in the malpractice action on behalf of successor counsel at the request of successor counsel's insurance carrier. The respondent did not consult with the client or the client's new attorney, nor did he obtain their consent before entering his appearance. On June 13, 1991, the respondent wrote a letter to successor counsel, disclosing that he had previously consulted with the client about the personal injury accident. The respondent wrote:

> We did not enter into a contract for employment. He did later indicate to me that he had secured other counsel to represent him.

I do not believe that my exposure to [the client] creates a conflict of interest, but I want you to be reminded of these facts. Please advise if you feel otherwise....

Successor counsel consented to the respondent's representation. The respondent deposed the client on July 18, 1991. He represented successor counsel for three years in the malpractice action. Throughout the litigation, one unresolved issue was the amount of damages to which the client was entitled due to successor counsel's negligence. The value of the client's case against the company was factored into that formula. That issue had been one aspect of the respondent's initial consultation with the client. The respondent withdrew his representation of successor counsel after the Commission filed its verified complaint on June 15, 1994.

We find that the respondent violated Prof. Cond.R. 1.9(a) by representing successor counsel in a matter in which counsel's interests were materially adverse to those of his former client in a substantially related matter.

The parties have agreed that several factors mitigate in the respondent's favor, including the fact that the respondent did not take advantage of information he obtained during his initial consultation with the client and that the respondent's representation of the client was minimal and did not extend much beyond information-gathering. The respondent likely would not have run afoul of his ethical obligations had he fully informed all clients, past and present, of his intended serial representations and obtained the requisite client consents. We therefore again conclude that a private admonition is appropriate and thus accept the agreed sanction.

Costs of these proceedings are assessed against the respondents.