Carol M. DOUGLAS, Individually and as the Administratrix of the Estate of Curtis K. Douglas, deceased, Appellant–Plaintiff,

v.

Deidre MONROE, Esq., et al., Appellees–Defendants.

No. 49A02–0004–CV–268.

Court of Appeals of Indiana.

Feb. 26, 2001.

---

Henry R. Price, James A. Mellowitz, Gregg S. Gordon, Price, Potter, Jackson & Mellowitz, P.C., Indianapolis, Indiana, Attorneys for Appellant.

David C. Jensen, John M. McCrum, Carli D. Fish, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellee Monroe.

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Carol M. Douglas ("Carol"), individually and as administratrix of the estate of her deceased son, Curtis K. Douglas ("Curtis"), appeals from the entry of summary judgment on Carol's legal malpractice claim in favor of appel-lee-defendant Deidre Monroe ("Monroe"). We affirm.

### Issue

Carol presents one issue, which we restate as whether a genuine issue of material fact regarding the existence of an attorney-client relationship between Monroe and Carol should have precluded summary judgment.

### Facts and Procedural History

On April 20, 1997, Curtis, an eighteen-year-old freshman at Indiana University Purdue University at Indianapolis ("IUPUI"), drowned at the Natatorium swimming facility. In August of that year, Carol began considering the possibility of filing a lawsuit in connection with Curtis's death. Because Carol was still grieving, her brother, Lionel Douglas ("Lionel"), looked into the possibility of bringing suit.

Shortly thereafter, while working as a security guard at a bank in Gary, Indiana, Lionel saw Monroe in the bank's lobby. He had gone to high school with her and knew she was now an attorney, but he had never engaged her professional services. They had a short conversation during which Lionel told her about his nephew's passing,[1] indicated that counsel might be sought, and inquired as to whether there was a time limit in which to bring suit. Monroe responded that he had two years. Monroe mentioned neither the 180–day limit in which to file a tort claims notice nor that Lionel should not rely on her advice. They had another short conversation in the bank lobby thereafter. Lionel did not believe that Monroe was representing him or Carol when he was talking to her. Supp. Record at 66. Lionel conveyed to Carol the two-year statute of limitations.

In November 1997, Carol spoke with her current counsel and first learned about the tort claims notice requirement. By then, more than 180 days had lapsed since Curtis's death. On March 26, 1999, Carol filed

---

1. During his deposition, Lionel could not recall whether he told Monroe that his nephew died "at college" or at "IUPUI." Record at 90.

a wrongful death/legal malpractice complaint against IUPUI, IUPUI Natatorium, Trustees of Indiana University, Edward Merkling, David Thibodeau, Chris Chin, Julie McKenney, Ryan J. Ellis, Danny A. Huffman, Jr., Adam Boatman, Jeff Ellis & Associates, Inc., and Monroe.[2] Carol alleged that Monroe's failure to inform Lionel of the 180–day tort claims notice requirement and Carol's subsequent failure to file a timely notice resulted in the barring of her wrongful death suit.

Monroe answered, denying the allegations. She then moved for summary judgment, asserting that no attorney-client relationship existed between her and Carol at any time, and that therefore, Carol's claim must fail. After Carol filed a response, the trial court held a hearing on the matter. On March 27, 2000, the trial court granted Monroe's motion for summary judgment.

### Discussion and Decision

Carol argues that summary judgment was improperly granted because "there is at the very least a question of fact about the existence of the attorney-client relationship." She boldly contends that in "no way is Monroe entitled as a matter of law to escape all accountability for willingly giving incorrect legal advice about a critically important legal issue to someone who consulted her in her capacity as an attorney." Encompassed in her argument are assertions of detrimental reliance and agency.

"The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which can be determined as a matter of law." *Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 936 (Ind.Ct. App.1996); *see* Ind. Trial Rule 56(C). "The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of proving that the trial court erred." *Bamberger*, 665 N.E.2d at 936. In review-

ing a motion for summary judgment, we apply the same standard as the trial court, and we resolve any question of fact or an inference to be drawn therefrom in favor of the non-moving party. *Id.* "We will affirm a trial court's grant of summary judgment if it is sustainable on any theory found in the evidence designated to the trial court." *Id.*

■ "To prove a legal malpractice claim, 'a plaintiff-client must show (1) employment of an attorney (duty); (2) failure by the attorney to exercise ordinary skill and knowledge (breach); (3) proximate cause (causation); and (4) loss to the plaintiff (damages).'" *Bernstein v. Glavin*, 725 N.E.2d 455, 462 (Ind.Ct.App.2000) (quoting *Fricke v. Gray*, 705 N.E.2d 1027, 1033 (Ind.Ct.App.1999), *trans. denied*), *trans. denied*. A defendant is entitled to judgment as a matter of law "when undisputed material facts negate at least one element of a plaintiff's claim." *McDaniel v. Bus. Inv. Group, Ltd.*, 709 N.E.2d 17, 20 (Ind. Ct.App.1999), *trans. denied*.

■ "[A]n attorney-client relationship need not be express, but may be implied by the conduct of the parties." *Matter of Kinney*, 670 N.E.2d 1294, 1297–98 (Ind. 1996) (citing *In re Anonymous*, 655 N.E.2d 67, 70 (Ind.1995) and *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind.Ct.App. 1991)). "Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Anonymous*, 655 N.E.2d at 71. "An important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice." *Id.* at 70. However, "[t]he relationship is consensual, existing only after both attorney and client have consented to its formation." *Kinney*, 670 N.E.2d

**2.** With the exception of Jeff Ellis & Associates, Inc., all defendants were granted summary

judgment. Monroe is the only defendant involved in the present appeal.

at 1297. Hence, a "would-be client's unilateral belief cannot create an attorney-client relationship." *Hacker*, 570 N.E.2d at 955.

In addressing Carol's argument, we briefly review cases concerning the question of an attorney-client relationship for legal malpractice purposes. In relation to a medical malpractice action, attorney Kinney helped a woman "answer some interrogatories, attended a deposition with her, and, at a court hearing which the woman apparently failed to attend, managed to secure a continuance of certain discovery deadlines." *Kinney*, 670 N.E.2d at 1297. Yet, our supreme court concluded:

> *Despite [Kinney's] provision of this nominal assistance, we find no evidence that he believed he was, in a general sense, representing the woman in the matter, much less that he consented to the formation of an attorney-client relationship.* The evidence adduced at hearing reveals that [Kinney] explicitly curtailed his affiliation with the woman and referred her to an attorney who was knowledgeable about medical malpractice actions. The hearing officer found that the respondent "told [the woman] that he would not represent her in the [medical malpractice case] or file it because of his belief that it lacked merit ...". At the court hearing regarding discovery, the respondent was expressly afforded the opportunity to file a formal appearance on the client's behalf, but declined to do so. Each of these facts indicates that the respondent did not consent to the formation of an attorney-client relationship and that his actions should have put the woman on notice that he did not represent her.

*Id.* at 1297–98 (emphasis added). Our supreme court went on to say:

> *Also absent is any indication that, during the pendency of the medical malpractice action, the woman affirmatively consented to the respondent's representation of her.* The malpractice complaint was officially filed pro se.

Opposing counsel's contact was to be the woman, not the respondent. The woman testified that the respondent told her that he did not routinely handle medical malpractice cases. When the respondent telephoned her to inform her of possible impending discovery sanctions, she failed to return his call, thus indicating that she did not recognize the respondent as her attorney and saw no need or held no desire to confer with him. In short, there is nothing in the record clearly establishing that the woman believed or had reason to believe that the respondent was her attorney in the medical malpractice action. *It appears that the assistance the respondent provided to her in relation to the malpractice action was fostered by his sympathy for her plight, and not by any desire to provide professional services to her.* Our conclusion is not meant to contradict the Commission's assertion that the giving of legal advice is an essential element of an attorney-client relationship. However, *the mere provision of nominal legal advice is not automatically dispositive where the existence of an attorney-client relationship is disputed.*

*Id.* at 1298 (emphasis added). Similarly, we have concluded that a buyer's attorney's preparation of closing documents and his act of presiding over a closing, standing alone, were insufficient to create a relationship or to render the attorney liable to the seller for any negligent acts associated with the transaction. *Hacker*, 570 N.E.2d at 956.

In contrast, our supreme court concluded that both an attorney and a putative client consented to the formation of an attorney-client relationship in *Anonymous*, 655 N.E.2d 67. In that case, however, (1) the attorney met with the putative client on several occasions and discussed a potential wrongful termination suit, a matter within the respondent's professional competence; (2) the attorney concluded that the putative client had a strong wrongful

termination case; (3) the putative client thought the attorney was acting as his attorney; and (4) the attorney should have been aware that the putative client thought the attorney was representing him, but did nothing to dispel this belief. *Id.* at 70–71.

■ We find the present case more similar to *Kinney* and *Hacker* than to *Anonymous.* Here, Carol never met or spoke with Monroe. Moreover, she did not attempt to contact Monroe, schedule an appointment with her, or consent to the formation of an attorney-client relationship with her. Carol neither entered into a contract for legal services with Monroe nor paid for advice from her. Carol never thought Monroe was representing her in the matter of Curtis's death. Indeed, when later contacted by her current counsel and asked if she was being represented, Carol replied "no." Further, there is no evidence that Monroe believed she was in any way representing Carol or that Monroe consented to the formation of an attorney-client relationship. Monroe's brief statement regarding the statute of limitations[3] appears to have been fostered by sympathy, not by any desire to provide professional services to a woman she did not know.

■ As for the detrimental reliance theory, we have stated:

> In certain cases, an attorney-client relationship may also be created by a client's detrimental reliance on the attorney's statements or conduct. An attorney has in effect consented to the establishment of an attorney-client relationship if there is "proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it."

*Hacker,* 570 N.E.2d at 956 (quoting *Kurtenbach v. TeKippe,* 260 N.W.2d 53, 56 (Iowa 1977)). "The cases actually applying this rule to find attorney liability are few, and liability has been found only when the attorney undertook, gratuitously or otherwise, to complete an affirmative act for the party who later brought suit." *Id.* We stressed in *Hacker* that the appellant would not be able to obtain an instruction on her reliance theory upon retrial unless she could "demonstrate either that she had a prior, continuous attorney-client relationship with [the attorney] or that [the attorney] agreed to act in her behalf in the transaction." *Id.* at 957. Here, Monroe undertook no affirmative act; there was no prior, continuous attorney-client relationship; and Monroe did not agree to act on Carol's behalf in any transaction. Rather, Carol's brother had a brief conversation with an attorney passing through a bank lobby one day, and during that conversation the attorney responded that the relevant statute of limitation was two years. Under the circumstances, Monroe did not know Carol would rely on this isolated statement, and any reliance Carol placed on the statement was not reasonable. Thus, we find Carol's detrimental reliance theory unavailing.

■ Finally, we address Carol's assertions of agency. To establish an actual agency relationship, three elements must be shown: (1) a manifestation of consent by the principal to the agent; (2) an acceptance of the authority by the agent; and (3) control exerted by the principal over the agent. *Johnson v. Blankenship,* 679 N.E.2d 505, 507 (Ind.Ct.App.1997), *aff'd* 688 N.E.2d 1250 (Ind.1997). Apparent agency is also initiated by a manifestation of the principal. *Swanson v. Wabash College,* 504 N.E.2d 327, 331 (Ind.Ct.App. 1987).

---

**3.** We note that Monroe's statement about the statute of limitations was not incorrect, but was simply not a complete answer to the question. An attorney engaged in an attorney-client relationship presumably would have had more information upon which to base his/her response and would have been expected to provide a more complete answer to such a query.

However, the necessary manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. It is essential that there be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship.

*Id.* at 332 (citations omitted). *"Generally,* the question of whether an agency relationship exists is a question of fact." *Id.* (emphasis added). However, if the evidence is undisputed, there are times when summary judgment is appropriate in agency cases. *See, e.g., Drake v. Maid–Rite Co.,* 681 N.E.2d 734 (Ind.Ct.App.1997); *Jarvis Drilling, Inc. v. Midwest Oil Producing Co.,* 626 N.E.2d 821 (Ind.Ct.App.1993), *trans. denied; Swanson,* 504 N.E.2d 327.

Here, there is evidence, albeit conflicting, regarding the first two prongs of the agency test. Resolving this evidence in favor of Carol as we must, *see Bamberger,* 665 N.E.2d at 936, we presume that there was a manifestation of consent by Carol to Lionel and that he accepted the authority. As for the third prong, Lionel's affidavit provides the only potential support for the notion that Carol had control over Lionel. Lionel's affidavit, submitted after Monroe filed her motion for summary judgment, states, "[a]t all times that I sought Deidre Monroe's advice, I was doing so under the direction and control of my sister Carol, who had asked for my help."

■■ "Trial Rule 56(E) requires that affidavits opposing summary judgment 'set forth such facts as would be admissible in evidence....'" *Estate of Shebel ex rel. Shebel v. Yaskawa Elec. America, Inc.,* 713 N.E.2d 275, 280 (Ind.1999). "Mere assertion of conclusions of law ... in an affidavit will not suffice." *Rubin v. Johnson,* 550 N.E.2d 324, 327 (Ind.Ct.App.1990), *trans. denied.* Lionel's statement about control was a legal conclusion and there-

fore inadmissible as evidence. However, as Carol correctly points out, neither Monroe nor the trial court noted this problem. "[W]hile trial court consideration of conclusory statements or matters in affidavits otherwise inadequate under T.R. 56(E) would constitute error, [Monroe's] failure to raise a timely objection constitutes waiver of such claim of error." *Paramo v. Edwards,* 563 N.E.2d 595, 600 (Ind.1990).

■ Although Lionel's allegedly conclusory statement will thus be considered on appellate review, our inquiry does not end simply because such conclusion recited the word "control." "Under T.R. 56(E), a party opposing summary judgment must come forth with specific facts showing that there is a genuine issue for trial." *Id.* Lionel's affidavit fails to set forth facts to support the notion of control. Specifically, there is no evidence that Carol instructed Lionel to seek a lawyer's advice, let alone Monroe's advice. There is no evidence that Carol told him when or where to speak with Monroe, gave him questions to ask her, outlined potential terms of employment, or gave him the power to bind her to an agreement, such as would support an attorney-client relationship. Further, there is no evidence that Carol was unaware of how to form such an attorney-client relationship, as she eventually did enter into such a relationship with her current counsel. Especially telling is Carol's previously mentioned deposition testimony that she never thought Monroe was representing her in the matter of Curtis's death. Under these circumstances, we conclude that Carol has failed to set forth sufficient specific facts to support an actual agency theory. *See id.* at 601.

Carol's apparent agency argument is likewise unpersuasive. Carol submitted no evidence regarding the necessary manifestation made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. *See Swanson,* 504 N.E.2d at 332. That is, there was no form

of communication, direct or indirect, by Carol, which instilled a reasonable belief in the mind of Monroe that Lionel was acting as her agent. Lionel's statements are simply insufficient to create an apparent agency relationship.

Although we sympathize with Carol's immense loss, we must conclude that the trial court properly granted summary judgment in Monroe's favor in this legal malpractice action.

Affirmed.

BAKER, J., and BARNES, J., concur.