

FILED

Mar 24 2023, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ian D. Mitchell
Katherine M. Haire
Reminger Co., L.P.A.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Thomas A. Brodnik
Paul L. Jefferson
Scott A. Milkey
McNeely Law, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Krieg DeVault LLP,

*Appellant-Defendant,*

v.

WGT V, LLC,

*Appellee-Plaintiff*

March 24, 2023

Court of Appeals Case No.
22A-PL-1744

Interlocutory Appeal from the
Marion Superior Court

The Honorable Heather A. Welch,
Judge

Trial Court Cause No.
49D01-1906-PL-26376

**Opinion by Judge May**
Judge Weissmann concurs.
Judge Crone dissents with a separate opinion.

**May, Judge.**

[1]     Krieg DeVault LLP ("Krieg") appeals the trial court's denial of the motion for summary judgment that Krieg filed in the lawsuit WGT V LLC ("WGT V") brought against Krieg for legal malpractice and breach of fiduciary duty relating to a commercial real estate transaction. On appeal, Krieg argues that the trial court erred because:

> (1) no attorney-client relationship existed between Krieg and WGT V;
>
> (2) without an attorney-client relationship, Krieg could not have breached any fiduciary duty to WGT V; and
>
> (3) the applicable two-year statute of limitations bars WGT V's claims against Krieg for actions that occurred in 2003 or 2004.

Finding genuine issues of material fact exist in the record before us, we affirm the trial court's denial of Krieg's motion and remand for further proceedings.

## Facts and Procedural History

[2]     The relevant facts most favorable to WGT V, the non-moving party, are as follows. In the 1960s, William Gerald Throgmartin ("Gerald") became involved in the operation of Gregg Appliances, Inc., which did business as H.H. Gregg ("Gregg"), and he eventually became Gregg's sole owner, chairman, and CEO. Around 1990, Gregg began using Krieg's legal services for real estate transactions and the expansion of Gregg's business. Gerald explained that, after Krieg became Gregg's lawyer, Gregg did not use any other

law firm during Gerald's tenure with Gregg. Gerald indicated Krieg helped with "every one" of Gregg's property transactions – "They put the leases together. They helped us buy it, close it. And they did every one of them." (App. Vol. IV at 63.) Paul Lindemann, a Krieg attorney, would either record the deeds himself or have someone from his office do it, "always." (*Id*.) Gerald's son, Jerry, became Gregg's chairman and CEO in the early 2000s. In 2005, Gregg was sold to a private equity firm.

[3] Between the 1990s and 2005, Krieg also provided lawyers to meet the Throgmartin family's personal needs. (*Id*. at 67.) Krieg's legal services assisted with Gerald's estate planning and formed several entities – *e.g.*, Dadus III, Inc.; Dadus V, Inc.; WGT, LLP – at Gerald's request to benefit Gerald's children – Jerry Throgmartin, Janice Malone, Monica Adams, Kelli Ball, and Sandra Smith. Krieg created prenuptial agreements and wills for various members of the family and represented family members with "any legal work within Indiana that we required." (*Id*. at 87, 92, 97.)

[4] The bills for services by Krieg would come to the Gregg offices. Gerald would know whether line items on the bills were for business or family matters based on the initials of the lawyer who performed the work. (*Id*. at 67.) Assisting Gerald with this process was Gregg's controller, Diane Lutz, who averred she was "point person for the Throgmartin Family regarding their financial affairs[.]" (App. Vol. V at 214.) In this role, Lutz served as a "conduit" between the Throgmartins and their lawyers. (*Id*.)

[5] In April 2003, Gregg purchased property in Georgia and was represented by Krieg attorney Brian Fritts in the transaction. In July 2003, Krieg attorney Paul Lindemann wrote a memorandum to Jerry outlining a plan for reorganizing Dadus V, Inc., and its limited liability partner, WGT, LLP, into a single limited liability company, WGT V, in which each of Gerald's children would own a 20% interest. In September 2003, Krieg attorney Matthew Carr drafted documents to accomplish that goal and filed WGT V's articles of organization with the Indiana Secretary of State's office. WGT V's operating agreement stated that its primary purposes were to "(i) acquire and finance the acquisition of real property either directly or indirectly, (ii) thereafter own, develop, rehabilitate, renovate, improve, finance, refinance, lease, operate, manage and sell or otherwise deal with real property, and (iii) engage in any lawful business, whether or not related or incidental to the foregoing." (App. Vol. IV at 141.) Jerry, who at the time was Gregg's chairman and CEO, was designated as WGT V's manager and registered agent.

[6] In October 2003, Gregg's COO, Dennis May, spoke with Fritts regarding a potential transaction in which Gregg would sell its Georgia property and a property in Ohio to WGT V, which would then lease the properties back to Gregg. At May's request, Fritts prepared conveyance documents for the transactions. In a November 2003 letter to May, Fritts stated that he had drafted a lease agreement, a limited warranty deed, and other documents, but that he needed additional information from May to finalize the documents for closing. In October 2003, WGT V wired $3.5 million to Gregg to purchase the

Georgia property, and in November 2003, Gregg began paying $30,000 each month to WGT V to lease the Georgia property.

[7] Fritts claims May never responded to his November 2003 letter or provided any of the requested information to finalize the documents. However, in June 2004, WGT V and Gregg executed a lease agreement for the Georgia property, and an invoice from Krieg indicates someone at Krieg revised that lease the month it was signed based on input from May and Jack Esselman, a commercial real estate broker who did work for both Gregg and the Throgmartin family.[1] (App. Vol. V at 81.) Jerry signed the lease on WGT V's behalf, and May signed on Gregg's behalf. Pursuant to the agreement, Gregg continued paying WGT V monthly rent of $30,000. There is no indication that any purchase agreement was ever executed or that any deed was ever executed or recorded for the transaction.[2]

[8] In 2005, Gregg was sold to a private equity firm. Jerry passed away in 2012. In 2017, Gregg filed for Chapter 11 bankruptcy and rejected its lease with WGT V. In January 2018, while negotiating a sale of the Georgia property, WGT V learned that Gregg remained the record title holder of the Georgia property. In July 2018, the property was sold for $2.8 million. Pursuant to a settlement

---

[1] The invoice from Krieg was sent to Gregg corporate office "c/o Jerry Throgmartin[.]" (App. Vol. V at 81.)

[2] In an affidavit, WGT's current CFO David Mennel stated that he "could not locate a copy" of those documents in WGT's files. (App. Vol. V at 5.)

agreement, Gregg's bankruptcy creditors received $2.7 million, and WGT V received $100,000.

[9] In June 2019, WGT V filed a complaint against Krieg, which was later amended, alleging that Krieg engaged in negligent conduct, i.e., committed legal malpractice, by "fail[ing] to obtain from Gregg the necessary executed documents to effect the sale" of the Georgia property and failing to record a deed "documenting the transfer of the" property. (App. Vol. II at 224.) WGT V also alleged Krieg breached a fiduciary duty by failing to disclose to WGT V that it was representing only Gregg in the Georgia transaction. In December 2021, Krieg filed a motion for summary judgment asserting that WGT V's claims were barred by the applicable two-year statute of limitations, that no attorney-client relationship was ever formed between Krieg and WGT V, and that Krieg did not breach a fiduciary duty. WGT V filed a response and designated evidence from affidavits and transcribed depositions. Krieg filed a reply. In April 2022, after determining genuine issues of material fact existed, the trial court denied Krieg's motion. Krieg requested the trial court certify its decision for interlocutory appeal, which the trial court did, and we accepted jurisdiction over the appeal.

## Discussion and Decision

[10] "The purpose of summary judgment under Indiana Trial Rule 56 is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law." *Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1266 (Ind. Ct. App. 2009), *trans. denied*. "Even

though Indiana Trial Rule 56 is nearly identical to Federal Rule of Civil Procedure 56, we have long recognized that 'Indiana's summary judgment procedure . . . diverges from federal summary judgment practice.'" *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (alteration in *Hughley*) (quoting *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994)). "In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" *Id*. (quoting *Jarboe*, 644 N.E.2d at 123). "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id*. at 1004.

[11] For the trial court to properly grant summary judgment, the moving party must have made a prima facie showing that its designated evidence negated an element of the non-moving party's claim, and, in response, the non-moving party must have failed to designate evidence to establish a genuine issue of material fact. *Cox v. Mayerstein-Burnell Co.*, 19 N.E.3d 799, 804 (Ind. Ct. App. 2014). "Only after the moving party carries its burden is the non-moving party . . . required to present evidence establishing the existence of a genuine issue of material fact." *Morris v. Crain*, 71 N.E.3d 871, 879 (Ind. Ct. App. 2017). The non-moving party may not rest on its pleadings, "but must set forth specific facts which show the existence of a genuine issue for trial." *Perkins v. Fillio*, 119 N.E.3d 1106, 1110 (Ind. Ct. App. 2019). "Mere speculation is insufficient to create a genuine issue of material fact to defeat summary judgment." *Schon v.*

*Frantz*, 156 N.E.3d 692, 698 (Ind. Ct. App. 2020) (quoting *Biedron v. Anonymous Physician 1*, 106 N.E.3d 1079, 1089 (Ind. Ct. App. 2018), *trans. denied*). "In deciding whether summary judgment is proper, we consider only the evidence the parties specifically designated to the trial court." *Bertucci v. Bertucci*, 177 N.E.3d 1211, 1221 (Ind. Ct. App. 2021) (citing Ind. Trial Rule 56(C), (H)).

[12] We review a trial court's summary judgment ruling de novo. *Mann v. Arnos*, 186 N.E.3d 105, 114 (Ind. Ct. App. 2022), *trans. denied*. We neither reweigh evidence nor judge witness credibility, but we accept as true those facts established by the designated evidence favoring the non-moving party. *Id.* at 115. Any doubts as to any facts or inferences to be drawn therefrom must be resolved in the non-moving party's favor. *Id.* "[W]e are not bound by the trial court's findings of fact and conclusions thereon, but they aid our review by providing the reasons for the trial court's decision." *Id.* "The party that lost in the trial court bears the burden of persuading us that the trial court erred." *Id.*

[13] "In a negligence action, a plaintiff must show a duty owed by the defendant to the plaintiff, a breach of that duty, and damages to the plaintiff proximately caused by the breach." *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991), *trans. denied*. "In the context of an action for attorney malpractice, this requires a plaintiff to show employment of the attorney (the duty), the attorney's failure to exercise ordinary skill and knowledge (the breach), and damages to the plaintiff proximately resulting from that failure." *Id.*

### 1. Attorney-Client Relationship

An attorney-client relationship "need not be express; it may be implied from the conduct of the parties." *Id*. "Creation of an attorney-client relationship is not dependent upon the formal signing of an employment agreement or upon the payment of attorney fees." *Matter of Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995). "Attorney-client relationships have been implied where a person seeks advice or assistance from an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Id*. "The relationship is consensual, existing only after both attorney and client have consented to its formation." *Hacker*, 570 N.E.2d at 955. "A would-be client's unilateral belief cannot create an attorney-client relationship." *Id*.

In his deposition, Gerald testified that the lawyer for WGT V was Krieg attorney Paul Lindemann and that Krieg had represented Gregg, every other entity Gerald created, and every person in his family. Three of Gerald's daughters submitted affidavits regarding their relationships with Krieg between the early 1990s and the present. Sandra's affidavit provided in relevant part:

> 2.     At all times since its organization in 2003, I have been a member of WGT V, LLC ("WGT V").
>
> 3.     I had also previously been a partner of WGT V Limited Partnership as well as a shareholder of Dadus V, Inc since the time those entities were created in the early 1990s.

4.     WGT V was originally formed in 2003 for multiple purposes, among which were estate and succession planning for my father W. Gerald Throgmartin, as well as for acquiring commercial real estate which it would subsequently lease to tenants, including Gregg Appliances, Inc. ("Gregg").

5.     From the time that WGT V was originally formed in 2003, Krieg DeVault, LLP ("Krieg DeVault") provided WGT V with legal representation on a wide variety of corporate issues, including its original creation as an Indiana limited liability company, and issues relating to the acquisition and leasing of real estate to Gregg.

6.     Specifically, in 2003, I, along with my siblings . . . met with one or more Krieg DeVault attorneys, on one or more occasions, who discussed the purposes for creating WGT V. At that time, Krieg DeVault offered to answer any questions that we may have about WGT V, and never indicated that it was not providing representation to WGT V.

7.     Prior to 2003, Krieg DeVault held similar meetings with my siblings and I with respect to both WGT Limited Partnership and Dadus V, Inc.

8.     I am not a sophisticated real estate investor, and therefore relied upon Krieg DeVault, both in my personal capacity as well as my capacity as a member of WGT V, for all real estate legal advice, including any and all legal requirements, to ensure that all legal requirements were met, and that all legal documents were completed, filed, and effective.

9.     Prior to the filing of the above captioned lawsuit, I was never told by Krieg DeVault that it did not consider WGT V, WGT Limited Partnership, or Dadus V, Inc. to be clients of Krieg DeVault.

10. Beyond the legal work Krieg DeVault performed for WGT V, it also provided all legal services which I required between 1990 and 2004.

11. Those legal services included, but are not necessarily limited to, providing me with counsel for legal work related to my partnership interest in WGT Limited Partnership and my shareholder interest in Dadus V, Inc.

12. I have also relied upon Krieg DeVault for legal services on multiple occasions since 2004 including, but not necessarily limited to, the preparation of a pre-nuptial agreement in 2005, trust & estate legal services which I requested and received in 2006, and representation in a civil tort matter in 2012.

13. At all times relevant to the above captioned matter, I have considered Krieg DeVault to be not only the attorney for WGT V, but also the "family attorney" for my family with respect to any legal work within Indiana that we required.

(App. Vol. IV at 85-87.) Affidavits from Kelli and Monica differed only as to paragraphs 11 & 12. Kelli's affidavit provided:

11. Those legal services included, but are not necessarily limited to, providing me with counsel for legal work related to my partnership interest in WGT Limited Partnership and my shareholder interest in Dadus V, Inc. Additionally, in or about 1993, Krieg DeVault represented me in the preparation of a certain First Amendment to Buy-Sell Agreement that was executed by and between myself, my brother Jerry Throgmartin, my father W. Gerald Throgmartin, and Gregg Appliances, Inc. Finally, Krieg DeVault represented me in the preparation of estate work and a pre-nuptial agreement, both of which were performed prior to 2004.

12.    I have also relied upon Krieg DeVault for legal services on multiple occasions since 2004 including, but not necessarily limited to, trust & estate legal services which I requested and received in or around 2007, corporate formation services in or around 2007, and estate & succession planning services in 2014.

(*Id*. at 91-92.)  Monica's affidavit provided:

11.    Those legal services included, but were not necessarily limited to, providing me with counsel for legal work related to my partnership interest in WGT Limited Partnership and my shareholder interest in Dadus V, Inc.

12.    I have also relied upon Krieg DeVault for legal services on multiple occasions since 2004 including, but not necessarily limited to, trust & estate legal services which I requested and received in 2007 and 2012.

(*Id*. at 96.)

[16]    Paul Lindemann testified Krieg formed WGT V in 2003 and he would have represented WGT V for "several years after that, I would guess."  (*Id*. at 109.) Lindemann acknowledged representing WGT V on other real estate transactions in Ohio and Illinois in 2004 and 2005.  As to the Georgia transaction at issue, Lindemann testified he was not involved, but he also testified he does not "remember back that far."  (*Id*.)  In preparation for his deposition, Lindemann reviewed the "entire file for WGT[,]" which he described as a "large" file.  (*Id*. at 106.)  During his deposition, the following was revealed:

Q. . . . But when you were in charge of forming entities, how did you generally navigate that? Specifically, I guess, my question is, is would you represent the entity or one of the individual owners in the formation, as a general practice?

A. In the formation of it?

Q. Yeah.

A. I mean, generally speaking, you're forming an entity because somebody told you they needed one. Right? So, you know, the question is, does that – does that new entity automatically become the client at that point and how do you navigate any potential conflicts of interest with – with the people who told you to form it. Right?

Q. Yeah. That's what I'm trying to understand.

A. Yeah. In the Throgmartin's case, as a general proposition, I'm not sure we thought too much about that, because WGT was an – in my mind, anyway, just an extension of WGT, Limited Partnership. It was the same entity, in a new form. So I'm not sure that we would have necessarily done an engagement letter for a new client, at that point.

(*Id.* at 112.)

[17]  WGT V also designated an affidavit from Diane Lutz, who averred:

7.  In this role serving as the point person for the Throgmartin Family regarding their financial affairs, I exchanged communications on multiple occasions with Matthew Carr and Paul Lindemann, both attorneys at Krieg DeVault, regarding work that Krieg DeVault was performing on behalf of WGT V,

LLC, WGT Limited Partnership, and Dadus V, Inc., all of which were owned by the Throgmartin Family.

8. To the extent either Matthew Carr and/or Paul Lindemann sent correspondence to my attention regarding WGT V, LLC, WGT Limited Partnership, and Dadus V, Inc., it was not in my role as Gregg's controller, but was instead in my role as the point person for the Throgmartin Family's affairs. Krieg DeVault, including Paul Lindemann, was aware of my role as the point person for the Throgmartin Family.

9. In my capacity of assisting Gerald Throgmartin, Jerry Throgmartin, and other members of the Throgmartin Family with their financial affairs, I cannot recall any attorneys from Krieg DeVault ever asking me to tell one or more members of the Throgmartin Family that they should obtain their own separate legal counsel due to the fact that Krieg DeVault was only representing Gregg in a real estate transaction that also involved the Throgmartin Family.

(App. Vol. V at 213-14.)

[18] In sum, the facts most favorable to WGT V reveal that, in 2003 and 2004, WGT V and Gregg were both owned by the Throgmartin family, led by Jerry Throgmartin, and represented by Krieg. While there are genuine issues of material fact about whether Krieg represented WGT V for the Georgia property transaction in particular, the evidence reveals Krieg represented WGT V, its predecessor entities, and individual members of the Throgmartin family during this same timeframe. In fact, during the same year that the botched Georgia transaction was to have occurred, Krieg assisted the Throgmartin family with the transfer of real property from WGT LLP into WGT V and assisted WGT V

with the acquisition of another Gregg property in Ohio. Moreover, in June 2004, Krieg revised the lease agreement for the Georgia property based on input from Gregg's May and from Esselman, a real estate broker who sometimes assisted Gregg and sometimes assisted the Throgmartin family, and Krieg sent the invoice for those revisions to Jerry Throgmartin, who was both Chairman of Gregg and manager of WGT V.[3] Thus, the designated evidence creates a genuine issue of material fact about whether Krieg was the lawyer for both Gregg and WGT V during the ultimately unconsummated Georgia transaction.

## 2. Fiduciary Duty

"'A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary.'" *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017) (quoting *Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App. 2010), *trans. denied*), *trans. denied*. In its amended complaint, WGT V asserted:

> 90. Krieg DeVault, in its role as WGT's counsel, or based upon WGT's status as a third party beneficiary of the Legal Services Contract, owed WGT a fiduciary duty to act in good faith and in WGT's best interest during the course of the attorney-client relationship.

---

[3] The record does not disclose why the failed transfer of the property was not uncovered during this process.

91.     Krieg DeVault, in its fiduciary capacity, was required to make truthful and complete disclosures to WGT.

92.     Krieg DeVault failed to provide WGT with truthful and complete disclosures to WGT including (among other things) that Krieg DeVault was representing only Gregg and not both Gregg and WGT with respect to the commercial real estate transaction involving the [Georgia] Property, and/or that Krieg DeVault was not acting in WGT's interests as a third-party beneficiary.

(App. Vol. II at 226.)

[20]     On appeal, Krieg asserts the trial court erred by not granting summary judgment on WGT V's fiduciary-duty claim because Krieg "never owed any such duty." (Appellant's Br. at 32.) In support, Krieg asserts: "While the relationship between an attorney and client is of a confidential and fiduciary nature, there can be no breach of a fiduciary duty here because, as discussed above, the threshold requirement of an attorney-client relationship between Krieg DeVault and WGT is absent[.]" (*Id.*) Because there are genuine issues of material fact about whether Krieg was WGT's lawyer, genuine issues of material fact also exist about whether Krieg had a fiduciary duty to WGT that it could have breached. Because Krieg did not demonstrate summary judgment was appropriate on the underlying claim, it could not be entitled on that ground to summary judgment on the claim that derived therefrom. *Cf. Miller v. Central Indiana Cmty. Foundation, Inc.*, 11 N.E.3d 944, (Ind. Ct. App. 2014) (where summary judgment was appropriate on all of husband's underlying tort claims,

summary judgment was also appropriate on wife's loss of consortium claim, as it was derivative of from husband's tort claims), *reh'g denied*.

### 3. Statute of Limitations

[21] "Statutes of limitations are legislative judgments and serve important purposes." *Miller v. Patel*, 174 N.E.3d 1061, 1066-67 (Ind. 2021). By encouraging prompt presentation of claims, statutes of limitation "spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006)

> Statute of limitations defenses are particularly appropriate for summary judgment determination. The party asserting it must make a prima facie showing that the action was commenced outside the statutory period by identifying (1) the nature of the plaintiff's action, so that the relevant statute of limitations period may be identified; (2) the date the plaintiff's cause of action accrued; and (3) the date the cause of action was brought, being beyond the relevant statutory period. If the moving party demonstrates these matters properly, the burden shifts to the opponent to establish facts in avoidance of the statute of limitations defense.

*City of Marion v. London Witte Group, LLC*, 169 N.E.3d 382, 390 (Ind. 2021) (internal citations and quotation marks omitted).

[22]　The parties agree the two-year statute of limitations provided by Indiana Code section 34-11-2-4[4] is applicable to WGT V's claims of attorney malpractice and breach of fiduciary duty.  (*See* Appellant's Br. at 19 & Appellee's Br. at 32.)  *And see Estate of Spry v. Batey*, 804 N.E.2d 250, 253 (Ind. Ct. App. 2004) ("The statute of limitations for a claim of legal malpractice is two years."), *reh'g denied*, *trans. denied*.  Krieg notes the Georgia transaction occurred in 2003 or 2004, but WGT V's claim was not filed until 2019, which was well past the two-year statute of limitations.   In response, WGT V argues the limitations period did not expire before its claim was filed because of the discovery rule.

[23]　Legal malpractice claims "are subject to the 'discovery rule[.]'" *Dickes v. Felger*, 981 N.E.2d 559, (Ind. Ct. App. 2012).  "Under the discovery rule, the statute of limitations does not begin to run until the plaintiff knows, or in the exercise of ordinary diligence could have discovered, that it has been injured from tortious conduct."  *City of Marion*, 169 N.E.3d at 390.  "For a cause of action to accrue, it is not necessary that the full extent of damage be known or even ascertainable, but only that some ascertainable damage has occurred." *Estate of Spry*, 804 N.E.2d at 253.   The diligence expected is "simply that an injured party must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party

---

[4] This code section provides, in pertinent part: "An action for: (1) injury to person or character; (2) injury to personal property; or (3) a forfeiture of penalty given by statute; must be commenced within two (2) years after the cause of action accrues."  Ind. Code § 34-11-2-4(a).

might exist." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006) (quoting *Mitchell v. Holler*, 429 S.E.2d 793, 795 (1993)).

[24] Here, the facts most favorable to WGT V indicate that, in the fall of 2003, WGT V paid Gregg $3.5 million for the Georgia property and Gregg thereafter remitted $30,000 per month in rent to WGT V. Gregg did not refuse to continue paying on the lease until 2017, and, even then, it was because Gregg was in dire financial circumstances, not because Gregg still owned the property it was paying to lease from WGT V. WGT V learned that Gregg was the title holder of record on the Georgia property in 2018, when WGT V was negotiating the sale of the Georgia property with a third party. While Krieg cites facts that it insists should have put WGT on notice that the deed had not been transferred, nearly all of those facts involved Gregg's COO May, who was not a member of WGT V. Where, as here, there is no definitive proof that WGT V had knowledge of the failed property transfer prior to 2017, "application of the discovery rule necessarily involves questions of fact*." Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 262 (Ind. 2014). The trial court properly denied summary judgment on Krieg's summary judgment based on the statute of limitations because genuine issues of material fact exist about "when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained[.]" *Wehling v. Citizens Nat. Bank*, 586 N.E.2d 840, 843 (Ind. 1992) (holding genuine issues of material fact precluded summary judgment on statute of limitations defense where presumed

landowners claimed they did not know of Bank's negligence until they attempted to sell property and found it already belonged to someone else).

## Conclusion

[25] For all these reasons, we affirm the trial court denial of Krieg's motion for summary judgment and remand for further proceedings.

[26] Affirmed and remanded.

Weissmann, J., concurs.

Crone, J., dissents with a separate opinion.

**Crone, Judge, dissenting.**

I respectfully dissent. The designated evidence indicates that WGT V did not ask Krieg to draft or record a deed for the Georgia property and did not ask Krieg to conduct a closing. Thus, the designated evidence establishes as a matter of law that any damages suffered by WGT V as a result of the botched Georgia transaction were not proximately caused by Krieg. In sum, Krieg cannot be liable for not doing something that its alleged client did not ask it to do. An attorney-client relationship exists for specific functions and only those requested by the client.

The designated evidence also establishes as a matter of law that WGT V, in the exercise of ordinary diligence, could have discovered that it was damaged by the Georgia transaction back in 2003 at the latest, and thus its claims are barred by the two-year statute of limitations. *See Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765 (Ind. Ct. App. 2003) (emphasis added) (noting that "legal malpractice actions are subject to the 'discovery rule,' which provides that the statute of limitations does not begin to run until such time as the plaintiff knows, or in the exercise of ordinary diligence *could have discovered*, that he had sustained an injury as the result of the tortious act of another"), *trans. denied*. WGT V was a sophisticated entity, and it simply defies credulity that a competent corporate officer of such an entity would pay $3.5 million for a property without executing a purchase agreement or receiving a deed. Consequently, I would reverse and remand with instructions to enter summary

judgment for Krieg on WGT V's claims for legal malpractice and breach of fiduciary duty.