**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

May 09 2013, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JENNIFER L. GRAHAM**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**RICK D. MEILS**
**JOHN W. MERVILDE**
Meils Thompson Dietz & Berish
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LP XXIV, LLC d/b/a/ LAS PALMAS APARTMENT HOMES and SLS MANAGEMENT, INC., | ) ) ) ) | |
| Appellants-Plaintiffs, | ) ) | |
| vs. | ) ) | No. 49A04-1207-PL-340 |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY and CARL LONG, | ) ) ) ) | |
| Appellees-Defendants. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Theodore M. Sosin, Judge
Cause No. 49D02-0701-PL-151

**May 9, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

LP XXIV, LLC d/b/a Las Palmas Apartment Homes (Las Palmas) and SLS Management, Inc. (SLS) appeal after a jury trial from a defense verdict in favor of American Family Insurance (AFI) and Carl Long. Las Palmas and SLS present the following restated, dispositive issue for our review: Did the trial court err by denying Las Palmas and SLS's motion for summary judgment on the issue of agency?[1]

We affirm.

Although this matter proceeded through a completed jury trial, this is an appeal from the trial court's ruling on cross-motions for summary judgment, among other motions and requests. The following facts were designated by the parties for a ruling on summary judgment. SLS is a property management company formed sometime in 1996 or 1997. In 2006, SLS, which had many employees, was the property manager for Las Palmas. Las Palmas was owned by LP XXIV, LLC, and is located in Indianapolis, Indiana. Long, who was an SLS employee, was the on-site property manager for Las Palmas in April 2006. Long was hired by Val Sklarov, who was the president of SLS in 2006, and who personally interviewed Long.

Tara Adams-Hanson, an SLS employee with authorization to do so, sent Long his job offer by what was known as a position offering letter. Long's duties were described in the letter to "include but are not limited to: hiring, firing, full management of 614 unit housing

---

[1] AFI presents an additional issue regarding the trial court's order denying AFI's motion for summary judgment on the issue of ratification. Because of the dispositive nature of the issue we address, we do not reach this alternative argument.

2

complex located at 3636 Mission Drive commonly known as Las Palmas Apartment Homes, and 24 hour on call for emergency purposes." *Appellees's Appendix* at 120.

During April 2006, two storms occurred that gave rise to two separately filed insurance claims due to the resulting storm damage at Las Palmas. After notifying SLS and at the direction of SLS, Long submitted the first claim in April 2006, based on damage caused by a wind storm. AFI, Las Palmas's insurer, appointed its employee, Vickie Herring, to be the adjustor for the claim. Las Palmas selected Stephen Gregory d/b/a Viper Construction Services (Viper) to make the necessary repairs related to the April storms.

Long asked Herring to pay the contractors, more specifically, Viper, and Ian Brown d/b/a Brown Roofing Co. a/k/a Brown Roofing, Inc. (Brown Roofing), directly with respect to the first storm claim. Herring prepared a letter dated April 19, 2006, as an authorization for direct payment. Herring needed a signed authorization letter from an authorized representative of the insured in order to facilitate payments directly to the contractors in lieu of the insured. Long did not sign the letter, but obtained a signed authorization from Sklarov instructing AFI to make direct payments to Viper. That authorization provided as follows:

> As representative of SLS Management Company Inc. I hereby authorize American Family Insurance to make all claim payments directed to Brown Roofing Co and Viper Construction for all repairs necessary as a result of the above captioned loss. This authorization is valid only for those storm damages sustained on 4/02/2006. This authorization may be revoked at our discretion with written notice to your company.

*Appellees' Appendix* at 153.

Herring testified in pertinent part about the authorization for direct payment to Viper during her deposition as follows:

3

Q: Can you identify that [Exhibit 4]?

A: That is the authorization for direct pay?

Q: Okay, and that was signed by Mr. Sklarov, correct?

A: That is correct.

. . . .

Q: Do you know who created the letter?

A: I did.

Q: You wrote that letter from top to bottom, didn't you?

A: I did.

Q: The only thing Mr. Sklarov had to do with that letter was that he signed it, is that correct?

A: I didn't know who he was at the time, so I gave it to [Long].

Q: And you gave it to [Long] because you told [Long] that you needed authorization to pay the contractors directly, is that correct?

A: Yes.

Q: And you did not accept [Long's] authorization to pay the contractors directly, did you?

A: I would have if he signed this, yes.

Q: Okay, so when someone else signed this, you became immediately aware that someone else had that authority, isn't that correct?

A: No, I saw where someone else signed it.

Q: Okay, well, why did you—

A: Why would I not question his signature any more than I would question [Long's]?

Q: Well, I think it says that he's the president of the company.

A: I can say I'm president of a company, it doesn't mean it's so.

Q: Fine, but [] Long didn't sign that authorization, did he?

A: No.

Q: And did that lead you to believe that [] Long did not have authority to direct the payments?

A: [] Long could have been on vacation and someone else signed for him, I don't get into what someone's hierarchy is, I don't know. I was dealing with [Long], I gave it to [Long], [Long] gave it back to me and it had [Sklarov's] signature.

Q: Okay, but when he gave it back to you and it had [Sklarov's] signature on it, you knew that [Sklarov] was the president of [SLS]?

A: I knew that [Sklarov] presented himself as president.

Q: Did you assume that that was a higher position in the company than property manager?

A: Did I assume?

Q: Yes.

A: If he says he's president, I think president's higher than manager.

4

Q: Okay, so as between [] Long and [] Sklarov, as far as you knew—and you're right, you know, he might've just written that on there just like [Long] might've said he was property manager. Between those two you knew that [] Sklarov had more authority for SLS [] than [] Long did?

A: I cannot tell you what—I did not know who had what authority and I don't know what authority he gave [Long] or didn't give [Long].

. . . .

Q: So are you telling me you recommended to [] Long that the payment not be made directly to the contractor?

A: That's exactly what I recommended.

Q: And did he insist that it be made directly to the contractor?

A: My response to him upon his request was [] I have never worked with these contractors before, I don't know who they are, I can't tell you anything about them. If you make this request and payments are [made] directly to the contractor, then you lose all control of how this project plays out, and if you authorize that to happen and things start going bad, it's not [AFI]'s fault at that point because we have—I am telling you upfront that that's not something personally that I would do, but if you want to direct me that way, that's your business as a representative of the company.

. . . .

Q: Okay, Now, again, you met with [] Long who was listed as the contact person and the only contact person on the first notice of loss, that's, what FNOL?

A: Yes.

Q: Okay. Do you know how he got to be listed as the contact person?

A: I don't know.

Q: He asked you to pay the contractors direct[ly] and you told him you'd need authorization, correct?

A: Yes.

. . . .

*Appellants' Appendix* at 38-40.

In late July, Long called in the claim for the second storm, a hail storm, which occurred on April 14, 2006. Long told Herring to handle the claim in the same manner as she had handled the first claim. Herring testified in pertinent part about this in her deposition as follows:

Q: Okay. Now as far as the second claim was concerned, there's not a copy of that letter in any of the claim files.

5

A: No, because it was a verbal—

Q: A verbal—

A: --authorization.

Q: From Sklarov?

A: From [Long], the property manager.

Q: But you know [Long] didn't sign that, so he didn't have the authority, right?

A: Just because he didn't sign it, you don't have to conclude that he did not have the authority to sign it.

Q: Okay, but I'm really confused now because you said he told you to handle it [the second claim] the same way you handled the first claim—

A: Right.

Q: --and on the first claim you had someone sign an authorization to pay the contractors directly, so either you didn't follow [Long's] instruction to handle the claim the same way you did the first time or you did and you say you didn't send a letter, so you did not follow [Long's] instruction to handle the second claim the same way you handled the first claim.

A: I think you're incorrect.

Q: Okay, where is the authorization that would show me that you handled the second claim the same way you handled the first claim?

A: When we were referring to "handling the claim in the same way" we were referring to how the work was to be done, that they were going to go off my estimate, that the contractors were going to continue to get paid direct[ly] because everything was ---or the contractor at that point, because there was only one, that everything was moving along and that they wanted to continue that process the way it had been going once that claim process started rolling.

Q: So is it your sworn testimony today that you did not attempt to obtain authority from the president of SLS to make any of the payments on the second storm?

A: It is my testimony that I took the word of the property manager whom I had dealt with at this point for several months and the president had never told me to deal with anyone differently, so it is my testimony that no involvement from that time that Mr.—I don't know how to pronounce his last name, [Sklarov], on April the 20th to the time that the second claim was reported, that never at any time did he tell me that [Long] did not have the authority to direct the claim. So with [Long] being the contact person, [Long] being the one that I always dealt with, [Sklarov] being aware of this claim, this first claim, knowing that I'm dealing directly with [Long] there was no indication that I should ever be dealing with anyone but [Long]. So when [Long] verbally directs me to make payment the same way on the second set of claims as we were doing on the first set of claims, there would be no reason for me to question that.

6

. . . .

A:  No I did not make that attempt.

Q:  Now, I believe that that letter limits direct payment to the contractors to the storm that occurred on April 2nd, 2006, is that correct?

A:  The written authorization, yes.

Q:  Yes.  Okay, and the written authorization that you wrote and that you required be signed, correct?

A:  I requested that he sign this.

. . . .

Q:  You said "Have someone sign this."

A:  "I need this signed" is what I said.

Q:  Because you needed authorization to do that?

A:  Yes, I wanted authorization to do that.  We pay direct[ly] to contractors, that's not an unusual thing.

Q:  Without authorization you do it?

. . . .

A:  Anyone with the insured's permission, yes.

Q:  Oh, okay, so the insured would have to give someone else authority to act on their behalf in that regard?

A:  "I want you to deal with my mother" or "I want you to deal with my father," "I want you to deal with my son," we do that, we accommodate their requests.

Q:  Does that letter say in it anywhere on this claim "I want you to deal with [] Long"?

A:  It doesn't say you don't either, I mean [Sklarov] never told me that he didn't.

*Id*. at 143-44.

The contract Long signed for Viper's services as the "authorized representative" of

Las Palmas on July 27, 2006, with regard to the first storm claim provided in pertinent part as

follows:

3.  Payment:  In consideration of Contractor's performance of these services, Contractor agrees to Accept the Insurance Estimate as Fair and Comprehensive and will not Bill, Charge, or otherwise Encumber Las Palmas Apartments for any additional costs, above the Insurance Estimate, for Labor, Materials, Transportation or any other Direct or Indirect Cost of the Project without prior written approval (Purchase Order).  Contractor will be paid by the Insurance Company directly as in previous Projects, and will communicate with the

7

authorized representative for both the Insurance Company and Las Palmas Apartments on all milestones and inspections.

*Id.* at 154.

Long signed an affidavit in which he stated there was no written or oral agreement limiting his authority as the apartment manager at Las Palmas, that he had the authority to submit claim notices to Las Palmas's insurance company, and did so regarding the claims at issue in this case. Long further stated that Sklarov was aware that Long had submitted the claims, and that he forwarded to Sklarov a signed copy of the contract Long had entered into with Viper. Additionally, Long stated that Sklarov had made at least two walk-throughs of the apartment buildings to review the repair work being completed by Viper.

Long's affidavit contains the following additional averments:

17. At one point, Sklarov received a check from [AFI] made payable only to Las Palmas, as opposed to previous checks which were payable to both Las Palmas and Viper, for the work Viper was performing at Las Palmas.

18. After receiving this check, Sklarov told me that he thought that he could get free decking, new gutters and down spouts from Viper even though these items were not included in the Contract.

19. One day Sklarov's office sent to me via facsimile a document to sign which stated that I agreed to retroactively limit my authority to act on Las Palmas' behalf.

20. The statement detailed in paragraph 18 and the document sent to me as explained in paragraph 19 above caused me to seriously question whether I wanted to continue working for Sklarov.

21. I refused to sign the document referenced in paragraph 19 and resigned my position as apartment manager with Las Palmas.

*Id.* at 132-33.

8

Herring's affidavit included her statement that she discussed the issue of payments for the claims with Sklarov by telephone on September 8, 2006. She indicated that at no time during their conversation did Sklarov tell her that Long had no authority to arrange for the direct payment of the contractors performing the repairs. He did request that no future payments be made to the contractors.

On January 7, 2007, Las Palmas, SLS, and Kidz Real Estate Group, LLC (Kidz), filed a complaint against Gregory, d/b/a Viper, Ian Brown, d/b/a Brown Roofing, Long, and AFI, alleging various theories of recovery based upon the failure to complete repairs at Las Palmas. Las Palmas successfully obtained a default judgment against Viper, based upon the allegations in the original complaint.[2] After the filing of further pleadings, Kidz was dismissed as a plaintiff in the action. The trial court heard argument on the parties' motions in limine and cross motions for summary judgment. On April 27, 2012, the trial court issued its order, a part of which is at the heart of this appeal, which reads in relevant part as follows:

> 3.) Defendant's Second Motion for Summary Judgment is *Granted* as to the issue of criminal conversion, all Kidz Real Estate claims, and any claims based upon inherent authority. The Court *Denies* Defendant's Motion for Summary Judgment as to [the] issue of agency arising out of actual or apparent authority, as material issues of fact remain regarding the nature and scope of Carl Long's authority to act on behalf of the remaining Plaintiffs, LP XXIV and SLS Management, Inc. The Court further *Denies* Defendant's Motion for Summary Judgment based upon ratification and the issue of theft coverage, until such a time as there is a jury determination on the issue of employee theft.
>
> 4.) Plaintiff's Motion for Summary Judgment on the issue of agency is also *Denied*, as the issues of fact that preclude Defendant's Motion for Summary

---

[2] The efforts to proceed on this default judgment or to set this judgment aside are relevant only to the issue of ratification, which we do not reach in this opinion.

Judgment on the issue of agency also preclude Plaintiff's Motion on the same issue.

*Id.* at 28-29 (emphasis in original). After the completion of a five-day jury trial, the matter concluded with a defense verdict. The trial court denied the motion to correct error filed by Las Palmas, and this appeal ensued.

Our appellate review in this situation has been described as follows:

As a general rule, an order denying summary judgment is not a final appealable judgment. Such a denial does not irretrievably dispose of one or more issues between the parties; neither does it determine nor foreclose the rights of the parties. Rather, the denial of a motion for summary judgment merely places the parties' rights in abeyance pending ultimate determination by the trier of fact. Thus a party who seeks review of denial of a motion for summary judgment must do so ordinarily by way of interlocutory appeal in accordance with Ind. Appellate Rule 4(B)(6). However once final judgment has been entered following trial, the ultimate determination of the trier of fact upon the merits of the claim has taken place, and the interlocutory nature of the denial of summary judgment terminates. As a result, a party who fails to bring an interlocutory appeal from the denial of a motion for summary judgment may nevertheless pursue appellate review after the entry of final judgment. In accordance with this approach, this court has long addressed appeals from denials of motions for summary judgment following entry of a final judgment or order. Accordingly, we conclude that the denial of a motion for summary judgment is reviewable on appeal following a final judgment entered after trial on the merits.

. . . .

On appeal from the denial of a motion for summary judgment, we apply the same standard applicable in the trial court. We must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law. Any doubt as to a fact, or an inference to be drawn, is resolved in favor of the non-moving party. Even if the trial court believes that the non-moving party will be unsuccessful at trial, summary judgment should not be entered where material facts conflict or where conflicting inferences are possible. In like fashion we use the same standard of review as the trial court in determining the propriety of judgment on the evidence. When the trial court considers a motion for judgment on the evidence, it must view

10

the evidence in a light most favorable to the non-moving party. Judgment may be entered only if there is no substantial evidence or reasonable inference to be drawn therefrom to support an essential element of the claim.

*Keith v. Mendus*, 661 N.E.2d 26, 35-36 (Ind. Ct. App. 1996) (internal citations omitted).

The parties contended that each was entitled to summary judgment on the issue of agency. "'Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former.'" *Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011) (quoting *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002)). An actual agency relationship is established by showing the following three elements: (1) Manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent. *Douglas v. Monroe*, 743 N.E.2d 1181 (Ind. Ct. App. 2001). Circumstantial evidence may be used to prove these elements, and there is no requirement that the agent's authority to act be conveyed in writing. *Dep't of Treasury v. Ice Serv., Inc.*, 220 Ind. 64, 41 N.E.2d 201 (1942). Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate. *Douglas v. Monroe*, 743 N.E.2d 1181.

We have stated the following about our Supreme Court's acknowledgement of three classifications of authority that exist when a person is acting as another's agent:

> In determining whether a person is acting as an agent, the court has recognized three classifications of authority: (1) actual authority; (2) apparent authority; and (3) inherent authority. Actual authority is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. Apparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent; it arises from the principal's indirect or direct manifestations to a third party and not from the

11

representations or acts of the agent. Inherent authority, which is grounded in neither the principal's conduct toward the agent nor the principal's representation to a third party[ ] but rather in the very status of the agent[,] . . . originates from the customary authority of a person in the particular type of agency relationship. [T]he acts of an agent with inherent authority only bind the principal where (1) the acts done are those which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, (2) the other party reasonably believes that the agent is authorized to do them, and (3) the other party has no notice that he is not so authorized.

*Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'rs & Land Surveyors, Inc.*, 852 N.E.2d 27, 31-32 (Ind. Ct. App. 2006).

In the present case, the trial court granted AFI's motion for summary judgment on the issue of inherent authority and that ruling is not before us on review. The denial of summary judgment on the issue of actual and apparent authority is before us. Based upon the language of the case law and designated evidence set forth above, we cannot say that the trial court erred by denying both cross-motions for summary judgment as to those issues.

There were genuine issues of material fact related to the nature and scope of Long's ability to act on behalf of SLS and Las Palmas. The record citations above are indicative of the unresolved inferences to be drawn from SLS's, more specifically, Sklarov's, actions or inaction with regard to the two insurance claims and how they were pursued. Resolution of those issues depended in large part on a determination of the credibility of the witnesses, which is a task for the trier of fact, and not appropriate in the summary judgment context. *See Beta Steel v. Rust*, 830 N.E.2d 62, 68 (Ind. Ct. App. 2005) ("[w]e also give no deference to a trial court's ability to weigh evidence and judge witness credibility, because no such weighing or judging is permitted when considering a summary judgment motion").

12

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.